No. 97,296

STATE OF KANSAS, *Appellee*, v. SIDNEY J. GLEASON, *Appellant*.
(329 P.3d 1102)

1128

1130

1132

Opinion filed
July 18, 2014.

*Sarah Ellen Johnson*, of Capital Appellate Defender Office, argued the cause, and *Rebecca E. Woodman*, of the same office, was with her on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

*Per Curiam*: Sidney Gleason was convicted by a jury of capital murder for the intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." K.S.A. 21-3439(a)(6). In a separate penalty phase, the same jury sentenced Gleason to death for the capital offense. The jury also convicted Gleason of separate charges of first-degree premeditated murder, aggravated kidnapping, aggravated robbery, and criminal possession of a firearm. On these convictions, the district court sentenced Gleason to a consecutive controlling prison sentence of life with no possibility of parole for 50 years.

We reject Gleason's challenges to the district court's jurisdiction over the capital murder charge and the sufficiency of the evidence to support his capital conviction and, finding no reversible guilt-phase errors, we affirm Gleason's convictions of capital murder, aggravated kidnapping, aggravated robbery, and criminal possession of a firearm. But we vacate Gleason's conviction of first-degree premeditated murder, and his corresponding hard 50 sentence, because that conviction is multiplicitous with his capital murder conviction.

Further, we reject Gleason's claims that the aggravating circumstances supporting imposition of his death sentence were either legally invalid or not supported by sufficient evidence. But because the district court failed to properly instruct the jury on its duty to consider mitigating circumstances, we vacate Gleason's death sentence and remand for resentencing. Given our decision to vacate the death sentence, we decline to address Gleason's statutory and constitutional challenges to the death penalty.

### FACTUAL AND PROCEDURAL BACKGROUND

On February 12, 2004, Gleason, Damien Thompson, Ricky Galindo, Brittany Fulton, and Mikiala "Miki" Martinez robbed Paul Elliott at knifepoint at his home in Great Bend. Sometime thereafter, Gleason and Thompson learned police had interviewed Fulton and Martinez about the robbery. Nine days after the robbery, Gleason and Thompson drove from Lyons to Great Bend where Gleason shot and killed Martinez' boyfriend, Darren Wornkey, wounding Martinez in the process. Thompson and Gleason then kidnapped Martinez and took her to a rural location where Thompson strangled, shot, and killed her. Gleason and Thompson left Martinez' body near the road and returned to Lyons. Later that evening, Gleason and Thompson returned to the scene of Martinez' murder, placed Martinez' body near a tree further from the road, and covered her body with small branches.

On February 22, 2004, Kansas Bureau of Investigation (KBI) Special Agent Cory Latham arrested Gleason and Thompson for the Elliott robbery. Five days later, the State jointly charged Gleason and Thompson with capital murder for killing Wornkey and Martinez. The State also charged both men with the first-degree premeditated murder and aggravated kidnapping of Martinez. Later, the State amended the complaint to charge both men with the attempted first-degree murder and aggravated robbery of Paul Elliott.

Thompson subsequently agreed to plead guilty to the first-degree murder of Martinez, to disclose the location of Martinez' body, and to testify truthfully in any criminal proceedings against Gleason. In return, the State agreed not to seek a hard 50 sentence against Thompson and to dismiss the remaining charges against him.

In an interview with Agent Latham, Thompson confessed to his role in the Elliott robbery, confessed to killing Martinez, identified Gleason as Wornkey's killer, and explained Gleason's roles in the robbery and in Martinez' kidnapping and murder. Thompson also led Latham and other officers to the location where he and Gleason hid Martinez' body.

At Thompson's plea hearing, he pled guilty to and was convicted of the first-degree premeditated murder of Martinez. The district court then dismissed the remaining charges against Thompson and agreed to the State's request to delay Thompson's sentencing until after Thompson testified at Gleason's preliminary hearing. After Thompson's conviction, the State amended Count 2 of the complaint against Gleason to charge Gleason with the first-degree premeditated murder of Wornkey, rather than Martinez.

At Gleason's preliminary hearing, three witnesses testified— Thompson, Fulton, and Galindo. Thereafter, the district court granted the State's request to add a charge of criminal possession of a firearm, bound Gleason over on all charges, formally arraigned him, and entered not guilty pleas on Gleason's behalf. The State gave oral and written notice of its intent to seek the death penalty. The court later granted Gleason's motion to dismiss the attempted first-degree murder charge arising from the attack on Elliott.

The day after Gleason's preliminary hearing, the district court sentenced Thompson in accordance with his plea agreement to a term of life imprisonment with no possibility of parole for 25 years.

*Jury Trial—Guilt Phase*

The State's first witness, Agent Latham, provided a comprehensive overview of the robbery/double homicide investigation, including extensive testimony about the substance of Thompson's confession. Defense counsel made no hearsay or confrontation objections to Latham's testimony about Thompson's statements. Several other witnesses also testified without objection about statements Thompson made during and after the commission of the crimes and after his arrest.

Thompson, who the State called as its last witness, answered a few preliminary questions but ultimately refused to testify. Over Gleason's objections, the district court declared Thompson an unavailable witness and granted the State's request to admit Thompson's preliminary hearing testimony. The district court overruled Gleason's motion for mistrial based on Thompson's refusal to testify.

*Testimony of Damien Thompson*

After Thompson refused to testify, his preliminary hearing testimony—both direct and cross-examination—was read into the record by the prosecutor, who read his own questions, and Agent Latham, who read Thompson's responses. Through the introduction of Thompson's preliminary hearing testimony, the State established the following facts.

In February 2004, Thompson lived in Lyons and sold narcotics with his cousin, Gleason. On February 12, 2004, Thompson went to Paul Elliott's house with Gleason, Fulton, Martinez, and Galindo to "pick[] up some money." According to Thompson, the group planned that Fulton and Martinez would get money from Elliott in exchange for sex and Gleason and Thompson would collect the money. Thompson stayed in Fulton's car while the others went inside. Martinez and Fulton returned to the car first, while Galindo and Gleason remained inside Elliott's house. Galindo and Gleason later returned to the car with a box of cigarettes and between $10 and $35. Thompson did not ask for details regarding what occurred inside Elliott's house during the robbery. However, he knew "it went bad" because the "old man [Elliott] got cut up."

The group returned to Fulton's house and discussed the robbery. Based on information the group received from Fulton before the robbery, Thompson believed Elliott would give them $500. When they said they did not get that money, Thompson forced Fulton and Martinez to strip down to their underwear, believing they had taken Elliott's money and hidden it from the rest of the group. Even after the two women disrobed and Thompson found no hidden money, he did not trust them.

The group remained at Fulton's house for a short time after the robbery and eventually went to Galindo's house where they all stayed the night. Thompson, Gleason, and Galindo were all concerned Martinez and Fulton might talk to the police about the robbery, but Thompson denied having any group discussions about these concerns at Galindo's house. Thompson also denied having any discussions that evening about harming Fulton or Martinez and denied ever having a conversation with Galindo about killing Martinez.

Sometime after the Elliott robbery, Thompson learned that either Fulton or Martinez had spoken with the police. Thompson confronted Fulton, demanding she "pick between her and [Martinez], [as to] which one [of the two should die]." Although Thompson was alone when he confronted Fulton, and Gleason did not tell him to do so, Thompson told Gleason about the confrontation after the fact.

Around 11 or 11:30 p.m. on February 20, 2004, Thompson, armed with a 9-millimeter pistol, and Gleason, carrying a .22 caliber revolver, drove from Lyons to Great Bend to make a dope run and "bring some intimidation" to Fulton or Martinez. When the two men arrived in Great Bend shortly after midnight, a marked police vehicle immediately began following their vehicle. Thompson drove to Martinez' house and parked across the street, and the police vehicle drove past Thompson's car.

Meanwhile, Martinez and Wornkey drove up in Wornkey's Jeep and parked in front of Martinez' house. Before Wornkey and Martinez could get out of the Jeep, Gleason got out of Thompson's car and approached the Jeep, carrying the .22 caliber revolver in his hand. Thompson fixed his eyes on his rearview mirror as he watched the police car drive away. He then heard three or four gunshots and looked toward the Jeep. Thompson could see Gleason standing next to the driver's side where Wornkey was seated, but he did not see if anything transpired between Wornkey and Gleason before the shooting.

After the shooting, Martinez got out of the Jeep and ran to the middle of the street, screaming, " 'Why, why, why.' " According to Thompson, Gleason told Martinez to calm down and get into Thompson's car, but neither Thompson nor Gleason used physical force or verbal threats to force her into the car. Instead, Thompson claimed Martinez got into the car "of her own accord." Thompson was "dumbfounded" at this point because he did not know Gleason was going to shoot Wornkey. After Gleason got into the car, Thompson drove out of Great Bend, taking back roads.

During the drive, Martinez "hysterically ask[ed] 'why, why, why' " and at some point told Thompson and Gleason she had been

shot in the leg. Thompson instructed her to "put something around her leg to tighten up."

Both Thompson and Gleason knew Martinez and Wornkey had a history of domestic violence, and it occurred to Thompson that Martinez could claim she shot Wornkey in self-defense. So Thompson "brung up the idea to give [Martinez] the pistol," and Gleason handed the loaded gun to Martinez. But Thompson quickly realized the flaws in his plan and retrieved the gun from Martinez.

After Thompson retrieved the gun, he and Gleason did not discuss what to do with Martinez. Thompson drove for about 15 minutes before parking the car and ordering Gleason and Martinez to get out. As Gleason, Martinez, and Thompson stood near the passenger side of Thompson's car, Thompson pointed his 9-millimeter pistol at Martinez' chest and pulled the trigger, but his pistol jammed. Martinez dove into the backseat of the car to escape, but Thompson pulled her out. Thompson then exchanged guns with Gleason and hit Martinez in the head with Gleason's .22 caliber revolver, causing Martinez to fall to the ground.

Thompson handed the revolver back to Gleason, placed his hands around Martinez' neck, and strangled her for about 5 minutes while Gleason held both guns. As Martinez struggled, scratching Thompson on the neck, Gleason stood by "watching," but he did not try to stop Thompson. However, as Thompson strangled Martinez, Gleason said, "When you get done, let me go next." Thompson responded that he "wasn't no mother fucking pervert." Thompson assumed from Gleason's comment that Gleason thought Thompson was raping Martinez because Martinez made noises as Thompson strangled her, it was dark outside, and Gleason had poor eyesight.

When he finished strangling Martinez, Thompson grabbed the 9-millimeter pistol from Gleason and shot Martinez in the chest. Thompson then told Gleason they were "even," meaning he and Thompson had each shot and killed one person. According to Thompson, it was entirely his idea to pull over and kill Martinez.

On cross-examination, Thompson testified it was "possible" that Gleason, due to his poor eyesight, had not seen Thompson try to shoot Martinez the first time when the gun misfired. Thompson

testified he thought he had killed Martinez by strangling her and tried to explain why he also shot Martinez:

"Q. [Defense counsel:] Why did you shoot her then? If you thought you had already killed her, then why did you get the gun and shoot her?

"A. [Thompson:] Why did I get the gun?

"Q. Right.

"A. When I seen [Gleason] approaching her with the gun, I just took the gun away from him and then I shot her, and why I did that, I don't know.

"Q. When you say [Gleason] approached her with the gun, he was walking towards her holding the gun; is that right?

"A. That's right.

"Q. You have no idea whether he intended to shoot her, do you?

"A. Well, yeah, his arm was extended outward with the gun in hand.

"Q. Did he fire any shots?

"A. No, because I stopped the gun.

"Q. Did he pull the trigger?

"A. No.

"Q. But you got the gun and, in fact, did fire shots into what is, in your opinion, [Martinez'] dead body?

"A. That's right."

Thompson testified he and Gleason left Martinez' body on the ground and drove back to Gleason's mother's house in Lyons. They arrived home around 2 or 3 a.m. and, at some point, placed their shoes and clothing in trash bags. Later that day, Thompson hid the trash bags in a salvage yard, purchased a scrub brush, and tried to clean Martinez' blood out of the backseat of his car.

That evening, Thompson decided to return to where they had left Martinez' body, and Gleason willingly accompanied him. Both men wore gloves and placed trash bags over their shoes so as not to leave any evidence. Thompson and Gleason moved Martinez' body to a location farther from the road, placed her body behind a tree, disposed of the gloves and the trash bags they had worn over their shoes by "[t]hrowing them out [in] different areas," and returned to Lyons.

On cross-examination, Thompson admitted that, as convicted felons, neither he nor Gleason could legally possess guns. Defense counsel also elicited testimony from Thompson about the terms of his plea agreement, emphasizing Thompson's agreement to plead

guilty to first-degree murder in exchange for the State's agreement not to seek the death penalty against him.

### Testimony of Other Witnesses and Physical Evidence

Other evidence at trial largely corroborated Thompson's testimony. The State's first witness, Agent Latham, testified at length about Thompson's postarrest statements and confession, which were substantially consistent with Thompson's testimony as recounted above.

Ricky Galindo testified he participated in the Elliott robbery with Gleason, Thompson, Fulton, and Martinez. According to Galindo, before the robbery Fulton and Martinez told the others that Elliott kept between $500 and $700 in his home. Galindo testified all five members of the group walked up to Elliott's house from Fulton's car, while Thompson stayed outside to act as a lookout.

Galindo testified he and Gleason armed themselves with knives and went inside Elliott's home, intending to rob him. They held Elliott down, and when he refused to give them any money, Gleason stabbed him in the neck. Galindo then continued to restrain Elliott while Gleason looked through the house for cash. Galindo and Gleason eventually returned to Fulton's car with less than $20, a cell phone, Elliott's checkbook, and a few cigarettes.

Brittany Fulton testified she and Martinez had been to Elliott's home before the robbery and had informed the others that Elliott kept large amounts of cash in his home. Fulton testified she drove Gleason, Thompson, Galindo, and Martinez to Elliott's home in her car. Fulton and Martinez went inside, intending that one of them would distract Elliott while the other took his money. That plan did not work, so Gleason and Galindo went inside to get the money. Like Thompson, Fulton testified Thompson did not go inside but instead waited in Fulton's car.

Galindo and Fulton both testified the group returned to Fulton's house after the robbery and began arguing because Galindo, Gleason, and Thompson suspected Fulton and Martinez of taking Elliott's money before the men went into Elliott's house. Fulton testified Thompson ordered her and Martinez to disrobe to confirm they were not hiding any money. Galindo testified that in Gleason's

presence "Thompson told [Martinez, Fulton], and me that we better not say nothing, he knew where we lived, and stuff like that." Fulton testified the group later went to Galindo's house, where they discussed not talking to the police. According to Fulton, the next morning when the group saw a news report about the Elliott robbery, Gleason and Thompson both stated that "if somebody talked to the cops, somebody would disappear."

A couple of days later, the group got back together. By then everyone in the group knew the police had interviewed Martinez and Fulton. Fulton testified that when the group asked Martinez what she told police, Martinez kept changing her story, causing the others to accuse her of lying. Martinez got upset and threatened to tell the police everything. According to Fulton, Thompson was not present at that time, but Gleason responded to Martinez' threat by jumping up, yelling, and saying, "[I]f somebody tells the cops something, people are going to disappear." Fulton testified she did not perceive this as a direct threat, but she later testified she was concerned for Martinez' and her own safety because Gleason, Thompson, and Galindo all had threatened them.

Galindo testified that sometime after the robbery he, Gleason, and Thompson discussed killing Martinez and also killing Wornkey if he got in the way. According to Galindo, during that conversation Gleason said "let's get rid of her" and ran his finger across his throat in a throat-slicing gesture. Galindo understood Gleason's comment and gesture to indicate he intended to kill Martinez. Later, without Gleason, Galindo and Thompson discussed killing Martinez. Galindo said he and Thompson planned to go to Martinez' house, choke Martinez, and shoot Wornkey. Galindo testified he had used cocaine the day he and Thompson planned to kill Martinez and Thompson refused to carry out any plans with Galindo until Galindo was sober. Galindo testified he did not want any part in killing Martinez or Wornkey but he was afraid to tell Gleason or Thompson that because he might become a target himself. Galindo testified he tried to avoid Gleason and Thompson after these conversations and, based on Galindo's fear of Gleason and Thompson, Galindo and his girlfriend even moved to a different address.

Fulton testified Thompson angrily confronted her sometime after the robbery, believing that either she or Martinez had talked to police. According to Fulton, Thompson said "things are going to happen" and that when he found out which woman had talked, "that's going to be the end of it." Fulton testified she was afraid of Thompson and she understood that Thompson "was going to do something."

Great Bend Police Officer Heather Smith testified she drove by Martinez' house shortly after midnight on February 21, 2004. As she approached the house, which was on Lakin Street between Holland and Hubbard, Smith saw Wornkey's Jeep parked in front of the house and noticed the Jeep's headlights were on. Smith testified she was familiar with Martinez and Wornkey, Martinez' house, and Wornkey's Jeep because she had "taken calls" at Martinez' house and had "talked to them" on prior occasions.

Smith also noticed a four-door passenger car approaching the stop sign at the intersection of Lakin and Hubbard. Smith drove through that intersection and past Wornkey's Jeep, which was parked on the left side of Lakin. Smith testified she did not see anyone inside the Jeep or near Martinez' house. Smith pulled over to the right side of Lakin, directly in front of Martinez' house, and allowed the car to pass her so she could log the tag number. Smith testified she routinely logged tag numbers of vehicles while she was on patrol. Smith could not see the car's driver, nor could she identify the car's color, although she testified it might have been green or blue. Smith later ran the car's tag number and learned it was registered to Thompson. According to Smith, Thompson's car continued driving westbound on Lakin.

After she wrote down Thompson's tag number, Smith drove around the block in order to take another look at the Jeep. The headlights had turned off, but Smith still did not see anyone in or around the Jeep. Smith drove past the Jeep, made a U-turn, and pulled behind the Jeep before logging Wornkey's tag number. As Smith drove away from Martinez' house, she did not hear any gunshots.

Irma Rodriguez, Martinez' neighbor, testified that sometime after midnight on February 21, 2004, she got up to go to the bath-

room and heard a noise "like something was hitting like metal on the trampoline that was beside the house." Rodriguez also heard someone screaming, recognized Martinez' voice, and went to her kitchen to look out the window. Rodriguez watched as two men pushed Martinez into a gray car before the car quickly drove away. Although Rodriguez was not wearing her glasses and could only see silhouettes, she recognized Martinez by her voice. After witnessing this event, Rodriguez went back to sleep.

Thompson's ex-girlfriend, J'Anna Edwards, testified Thompson and Gleason left Lyons around 11:30 p.m. on February 20, 2004, and returned home about 2:30 the next morning. Later that morning, Edwards noticed several scratches on Thompson's neck and arm. Edwards asked Thompson, and later Gleason, about the scratches. Both men instructed her not to ask about the injuries. The State admitted into evidence several booking photographs taken on February 22, 2004, showing scratches on Thompson's arm, throat, and neck.

KBI Agent Steve Bundy testified he recovered trash bags containing Gleason's and Thompson's shoes and clothing from the salvage yard where Thompson said he had hidden the bags. Based on information from Thompson, investigators also recovered both murder weapons—the .22 caliber revolver and the 9-millimeter semiautomatic pistol. Thompson had given both guns to his younger brother, and the guns passed through several hands before officers recovered them. Bundy submitted the 9-millimeter pistol to the KBI for testing, but the State presented no fingerprint evidence.

KBI forensic scientist James Newman testified he found a Dollar General receipt in the backseat of Thompson's car, found and tested at least three areas of blood from the backseat of Thompson's car, and discovered a scrub brush in Thompson's trunk. Newman tested several pieces of evidence against a known blood sample from Martinez and testified Martinez' blood matched blood found in several locations: (1) the pavement and grass where Wornkey was shot; (2) on the backseat of Thompson's car; (3) in a bullet hole in the ground at the Martinez crime scene; and (4) on Gleason's and Thompson's shoes. Additionally, a partial DNA profile

taken from the scrub brush found in Thompson's trunk was consistent with Martinez' blood, but the profile was insufficient to make a positive match.

Terri Canterbury, manager of the Lyons Dollar General store, verified that the receipt found in Thompson's car originated from the Lyons store and verified the purchase of two scrub brushes on the afternoon of February 21, 2004. Canterbury testified she recalled speaking to a KBI agent about the receipt and identifying the clerk who rang up the sale.

KBI firearm and tool mark examiner Amy Coody identified a bullet fragment recovered from Wornkey's body as a .22 caliber bullet. Agent Latham testified that because revolvers do not eject spent shell casings, the absence of any spent shell casings at the Wornkey crime scene was consistent with Thompson's statement that Gleason used a .22 caliber revolver to shoot Wornkey.

Latham also testified that officers discovered a live round of 9-millimeter ammunition at the Martinez crime scene, which was consistent with Thompson's statement that his pistol jammed when he first tried to shoot Martinez. Latham explained that normally when a jammed pistol is cleared, a live round is ejected. Further, Coody identified a bullet recovered from a hole in the ground at the Martinez crime scene as having class characteristics similar to bullets she test-fired from Thompson's 9-millimeter pistol. And Latham explained that the recovery of the bullet from a hole in the ground corroborated Thompson's statement that he shot Martinez in the chest as she was lying on her back on the ground.

Martinez' autopsy revealed a close-range gunshot wound to her chest, distant-range gunshot wounds to her right thigh and right calf, and a possible gunshot wound just above her right elbow. Wornkey's autopsy revealed intermediate-range gunshot wounds to his head and left shoulder and two distant-range gunshot wounds to his upper right arm. Mary Dudley, the district coroner, performed autopsies on Martinez and Wornkey and testified the wound to Martinez' right leg could have been caused by the same bullet that passed through Wornkey's right arm.

*Defense Case-in-Chief*

Gleason presented testimony from several witnesses in his case-in-chief. Optometrist David Cooper testified he examined Gleason in April 2005, more than 1 year after the double homicide. Cooper diagnosed Gleason as nearsighted in both eyes and testified Gleason had trouble seeing farther than 13 inches in front of him. On cross-examination, Cooper admitted he did not know the condition of Gleason's eyes in February 2004, but he assumed his condition would have been the same. Cooper also testified that based on Gleason's April 2005 diagnosis, Gleason likely could have seen the form of a person standing at least 4 feet away but could not have detected that person's eye color or discerned words on that person's clothing.

Sylvia Krause, a clerk from the Lyons Dollar General store, testified she spoke with a KBI agent in February 2004 regarding two men who purchased scrub brushes. According to Krause, one man was black and the other was "a taller skinny white man." Krause testified Gleason looked "vaguely familiar" but she could not state whether she saw Gleason in the store on the day the scrub brushes were purchased.

KBI Special Agent Delbert Hawel testified he interviewed Canterbury and Krause several days after the double homicide. Canterbury told Hawel she worked on February 21, 2004, and recalled being approached by a white male who asked about scrub brushes. Krause told Hawel she remembered two men, one black and one white with light-colored hair, asking Canterbury about scrub brushes and purchasing scrub brushes at Krause's register. Hawel testified he showed Krause a series of eight photographs, including photos of Gleason and Thompson, and Krause identified Thompson as the black male who purchased the scrub brushes.

Finally, Great Bend Police Officer William Widiger testified he interviewed Martinez' neighbor, Irma Rodriguez, with an interpreter's assistance. Rodriguez told Widiger she saw Wornkey and Martinez arguing on the evening of the double homicide and saw Wornkey bang a bat on a nearby trampoline. Rodriguez also saw Wornkey's Jeep at Martinez' house around midnight and could see

Wornkey and Martinez sitting in the Jeep. Next, she saw a gray passenger car drive up, saw two men forcibly remove Martinez from the Jeep and put her in the car, and saw the two men go back to the Jeep and put their hands in the driver's window. The two men then got into the car and drove off.

The jury deliberated 2 hours and 12 minutes before finding Gleason guilty of capital murder under K.S.A. 21-3439(a)(6) for the murders of Wornkey and Martinez, premeditated first-degree murder for the killing of Wornkey, aggravated kidnapping of Martinez, aggravated robbery of Elliott, and criminal possession of a firearm.

### Penalty Phase and Sentencing

In order to meet its burden to demonstrate the death penalty was warranted because aggravating circumstances were not outweighed by mitigating circumstances, the State alleged four aggravating circumstances: (1) Gleason had a prior felony conviction in which he inflicted great bodily harm, disfigurement, dismemberment, or death on another, (2) Gleason knowingly or purposely killed or created a great risk of death to more than one person, (3) Gleason committed the crime in order to avoid or prevent his lawful arrest or prosecution, and (4) Martinez was killed because she was a prospective witness against Gleason. See K.S.A. 21-4625 (listing aggravating circumstances).

The State presented evidence of Gleason's prior felony conviction for attempted voluntary manslaughter. Agent Latham testified that less than 1 month before the double homicide that is the subject of this case, Gleason was released on parole from his sentence for that conviction. Further, Latham testified that at the time of Gleason's trial in this case, the victim of Gleason's prior crime still had a bullet in his chest, scars from three gunshot wounds, and a surgical scar from the removal of a bullet from his hip.

Latham also testified about the connection between the double homicide and the Elliott robbery. Latham explained that police interviewed Martinez and Fulton about the Elliott robbery and Gleason knew about the interviews. Through his investigation, Latham learned Gleason had threatened others who participated

in the robbery and suggested that anyone who talked to police would "disappear." According to Latham, Martinez was a prospective witness against Gleason because of her involvement in the Elliott robbery.

Gleason asserted numerous mitigating circumstances including but not limited to: (1) He had an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; (2) he was relatively young (age 24) at the time of the crime; (3) the public would be adequately protected from him by a term of imprisonment; (4) he committed the underlying crimes with Thompson, who significantly participated and planned the crimes; (5) Thompson received a life sentence and would be eligible for parole in less than 23 years; (6) Gleason was deprived of contact with his mother in his youth due to her incarceration; (7) he and both of his siblings were currently in jail or prison; (8) he was an obedient child and an excellent student when he lived with his great aunt; and (9) he is loved by his family. See K.S.A. 21-4626 (providing nonexclusive list of mitigating circumstances).

In support of mitigation, Gleason presented testimony from his mother, great aunt, two brothers, and his childhood pastor. Highly summarized, Gleason's mother testified that while she was in prison on drug charges, Gleason lived with his great aunt from the time he was 4 or 5 years old until he was 12 or 13 years old. Gleason's witnesses testified that during this time period Gleason was well-behaved and a good student. Gleason and his brothers, both of whom were incarcerated at the time of Gleason's trial, essentially "ran wild" in their early teens after being reunited with their mother upon her release from prison. Gleason's great aunt testified that Gleason was artistic and identified two exhibits as artwork Gleason created in his early 20's.

Ultimately, the jury found the existence of all four aggravating circumstances alleged by the State beyond a reasonable doubt, determined the aggravating circumstances were not outweighed by any mitigating circumstances, and unanimously agreed to sentence Gleason to death.

At sentencing, the district court accepted the jury's guilt-phase and penalty-phase verdicts and imposed a sentence of death for the capital murder conviction. The court also imposed a consecutive controlling sentence of life without the possibility of parole for 50 years for the first-degree murder conviction, which included concurrent prison sentences of 586 months for the aggravated kidnapping conviction, 59 months for the aggravated robbery conviction, and 8 months for the firearm conviction. Finally, the court imposed periods of lifetime postrelease supervision for each noncaptial conviction.

Because Gleason was sentenced to death, this court's jurisdiction arises under K.S.A. 21-4627(a).

### CHALLENGES TO THE CAPITAL MURDER CONVICTION

We first consider Gleason's challenges relating solely to his capital murder conviction. He claims (1) the district court lacked subject matter jurisdiction over the capital charge, (2) the State failed to prove every element of capital murder, (3) the district court failed to adequately instruct the jury on the law of aiding and abetting, and (4) the district court erred in refusing his request for an instruction on felony murder as a lesser included offense of capital murder. We reject each of these challenges.

*The district court had subject matter jurisdiction over the capital murder charge.*

Gleason claims the district court lacked subject matter jurisdiction over the capital murder charge because his actions in personally killing Wornkey and aiding and abetting Thompson's killing of Martinez do not constitute capital murder as defined in K.S.A. 21-3439(a)(6). This issue raises questions of jurisdiction and statutory interpretation, both of which are questions of law subject to de novo review. *State v. Sales*, 290 Kan. 130, 134, 224 P.3d 546 (2010).

District courts have subject matter jurisdiction to hear all felony and other criminal cases arising under Kansas statutes. K.S.A. 22-2601. Capital murder is a felony and, as charged in this case, is the "intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or

transactions connected together or constituting parts of a common scheme or course of conduct." K.S.A. 21-3439(a)(6). Because it was undisputed that Thompson personally killed Martinez, the State relied on a theory of aiding and abetting as codified in K.S.A. 21-3205 to support its claim that Gleason was responsible for the intentional, premeditated killing of Martinez—the second murder necessary to support the capital murder charge against Gleason.

Gleason acknowledges that under the aiding and abetting statute "[a] person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." K.S.A. 21-3205(1). But he focuses on the phrase "to commit *the crime*," arguing that "the crime" at issue here is capital murder based on killing more than one person and "[n]either 21-3439(a)(6) nor 21-3205(1) contain language which would allow the State to hybridize two killings into one unit of prosecution for capital murder under 21-3439(a)(6) against an individual . . . who neither actually killed more than one person nor aided and abetted another's act of killing more than one person." Put more simply, Gleason argues that when the aiding and abetting statute is read in conjunction with the capital murder statute, it is clear that the capital murder statute applies only when the defendant *either* personally kills two people *or* aids and abets the killing of two people. Gleason argues his actions in killing Wornkey and aiding and abetting Martinez' murder does not constitute capital murder as defined in K.S.A. 21-3439(a)(6).

But contrary to Gleason's argument, nothing in the plain language of K.S.A. 21-3439 or K.S.A. 21-3205(1), or in our prior case-law, suggests a person must *either* personally kill more than one victim *or* aid and abet the killing of more than one victim to be charged with capital murder under K.S.A. 21-3439(a)(6). Further, "the crime" at issue for purposes of aiding and abetting liability in this case is not capital murder; rather, it is "the crime" of intentional, first-degree premeditated murder committed against Martinez by Thompson.

A defendant can be convicted of intentional, premeditated murder under a theory of aiding and abetting as long as the State proves the defendant shared the principal actor's premeditated intent to

murder the victim, knowingly associated with the unlawful venture, and participated in such a way as to indicate he or she was facilitating the success of the venture. *State v. Overstreet*, 288 Kan. 1, 11, 200 P.3d 427 (2009); *State v. Baker*, 287 Kan. 345, 366, 197 P.3d 421 (2008); *State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 (2005); see also *State v. Scott*, 286 Kan. 54, 121, 183 P.3d 801 (2008) ("Even if a capital murder is predicated on a theory of aiding and abetting, we require that the defendant must intentionally aid or abet with the intent to promote or assist in the commission of the crime.").

Accordingly, the State may rely on the theory of aiding and abetting to support one or more of the intentional, premeditated murders necessary to support a capital murder charge under K.S.A. 21-3439(a)(6) for the killing of multiple victims. The district court, therefore, had subject matter jurisdiction over the capital murder charge.

*The State proved every element of capital murder.*

Next, Gleason challenges the sufficiency of the evidence to support his capital murder conviction. To satisfy a criminal defendant's right to due process under the Fourteenth Amendment to the United States Constitution, the State is required to prove "every fact necessary to constitute the crime" charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); see also *State v. Switzer*, 244 Kan. 449, 450, 769 P.2d 645 (1989).

"When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citations omitted.] The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. [Citation omitted.]" *State v. Raskie*, 293 Kan. 906, 919-20, 269 P.3d 1268 (2012).

Here, the State was required to prove beyond a reasonable doubt that (1) Gleason killed Wornkey and Martinez, (2) the killings were intentional and premeditated, and (3) the killings were part of the same act or transaction or two or more connected transactions. See

K.S.A. 21-3439(a)(6); *Scott*, 286 Kan. at 63 (discussing elements of capital murder). Gleason claims only that the State failed to prove the third element.

This element "requires that the multiple killings be related to one another in some way, that they occur 'as a part of the same act or transaction,' or 'in two or more acts . . . connected together or constituting parts of a common scheme or course of conduct.' " *State v. Harris*, 284 Kan. 560, 572, 162 P.3d 28 (2007) (quoting K.S.A. 21-3439[a][6]). Although Gleason's argument as to this issue is murky, he seems to suggest that there is no evidence the murders are related because there is no evidence he and Thompson talked about killing Wornkey or that Thompson knew Gleason intended to kill Wornkey, and no evidence he and Thompson talked about killing Martinez on the way to Great Bend or that Gleason knew Thompson intended to shoot Martinez.

But this argument ignores our standard of review, which requires us to view the evidence in the light most favorable to the State. Here, the State presented evidence that Gleason and Thompson armed themselves and drove to Great Bend to "bring some intimidation" to Martinez based on their mutual belief Martinez had talked to police about the Elliott robbery—a robbery in which Thompson and Gleason participated. Thompson parked across the street from Martinez' house; and when Martinez and Wornkey arrived home, Thompson watched as Gleason approached Wornkey's Jeep and shot and killed Wornkey, wounding Martinez. Gleason and Thompson then kidnapped Martinez and took her to a rural location where Thompson strangled, shot, and killed her. Viewing this evidence in the light most favorable to the State, we are convinced a rational jury could have found beyond a reasonable doubt that the murders of Martinez and Wornkey were sufficiently related to support the capital murder charge.

*The district court adequately instructed the jury on the law of aiding and abetting.*

Next, Gleason argues the aiding and abetting instruction, when considered in conjunction with the elements instructions on the capital murder charge and lesser included crimes, failed "to ade-

quately convey to the jury that, in order to convict [him] as an accomplice to the crime of capital murder, it must find beyond a reasonable doubt that [he] *himself* had a specific, premeditated intent to kill'" Martinez.

*Standard of Review*

Because Gleason objected to this jury instruction on different grounds at trial, we will consider this asserted error as raised for the first time on appeal. See *State v. Ellmaker*, 289 Kan. 1132, 1138-39, 221 P.3d 1105 (2009), *cert. denied* 560 U.S. 966 (2010). We review instruction errors raised for the first time on appeal for clear error, even in capital cases. See K.S.A. 22-3414(3); *State v. Williams*, 295 Kan. 506, 515, 286 P.3d 195 (2012); *State v. Robinson*, 293 Kan. 1002, 1036, 270 P.3d 1183 (2012) (applying clear-error rule to unpreserved guilt-phase instruction error in capital case); *State v. Kleypas*, 272 Kan. 894, 939-40, 941-42, 40 P.3d 139 (2001) (same), *cert. denied* 537 U.S. 834 (2002), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

Applying *Williams'* framework, we first determine whether the instruction was erroneous. If we find error, we then review the entire record de novo to determine whether reversal is required. Reversal is required only if we are firmly convinced the jury would have reached a different verdict absent the instruction error. Gleason bears the burden of establishing clear error under K.S.A. 22-3414(3). See *Williams*, 295 Kan. at 515-16.

*Analysis*

At the time Gleason committed the underlying offenses in this case, the aiding and abetting statute provided in relevant part:

"(1) A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.

"(2) A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended." K.S.A. 21-3205.

Here, in Instruction No. 9 the district court instructed the jury on a modified form of PIK Crim. 3d 54.05:

"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime.

"Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor. To be guilty of aiding and abetting in the commission of a crime the defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed."

Gleason acknowledges that the instruction's first paragraph mimics the first paragraph of PIK Crim. 3d 54.05 and is consistent with K.S.A. 21-3205(1). But he argues this language was inadequate to inform the jury that a " 'person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim,' " as stated in *State v. Engelhardt*, 280 Kan. 113, 132, 119 P.3d 1148 (2005).

Gleason's argument as to this issue is foreclosed by our recent decision in *State v. Betancourt*, 299 Kan. 131, 322 P.3d 353 (2014). There, we rejected a similar challenge to the aiding and abetting instruction by the defendant in a first-degree premeditated murder case and reaffirmed that PIK Crim. 3d 54.05 accurately expresses the law on aiding and abetting when read in conjunction with the elements instruction for first-degree premeditated murder. 299 Kan. at 135-36.

As in *Betancourt*, the aiding and abetting instruction given here, when read in conjunction with the element instructions, accurately advised the jury as to the law on aiding and abetting. In fact, the instructions given here arguably directed the jury more clearly than did the instructions at issue in *Betancourt*. Significantly, the *Betancourt* jury instruction included only the language of the first paragraph of what was Instruction No. 9 in this case. But here the jury was further instructed: "To be guilty of aiding and abetting in the commission of a crime the defendant must willfully and know-

ingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed."

This language draws directly from our prior caselaw explaining the law on aiding and abetting. See *Betancourt*, 299 Kan. at 134 (citing cases); see also *Rosemond v. United States*, 572 U.S. ___, 134 S. Ct. 1240, 1248, 188 L. Ed. 2d 248 (2014) (discussing Judge Learned Hand's "canonical formulation" of intent required to prove aiding and abetting: "To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.' " [quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S. Ct. 766, 93 L. Ed. 919 (1949)]).

Thus, Instruction No. 9 fully informed the jury on the law of aiding and abetting. Further, when Instruction No. 9 is considered in conjunction with other instructions, the court fully informed the jury that in order to find the defendant guilty of capital murder, it must first find that Gleason premeditated and intended both murders. See *State v. Llamas*, 298 Kan. 246, 261, 311 P.3d 399 (2013) ("When we review claimed instructional error, 'we examine the instructions as a whole, rather than isolate any one instruction.' " [quoting *Ellmaker*, 289 Kan. at 1139-40]).

For instance, Instruction No. 10 informed the jury as to the elements of capital murder:

"To establish this charge, each of the following claims must be proved:

"1. That Sidney Gleason intentionally killed Darren R. Wornkey and Mikiala 'Mikki' Martinez;

"2. That such killings were done with premeditation;

"3. That the premeditated and intentional killings of Darren R. Wornkey and Mikiala 'Mikki' Martinez were part of the same act or transaction and/or two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct; [and]

"4. That this act occurred on or about the 21st day of February, 2004, in Barton County, Kansas."

Additionally, the trial court instructed the jury on the lesser included offenses of first-degree and second-degree murder. Both

these instructions advised the jury it must find "Gleason intentionally killed" Martinez. Further, the first-degree murder instruction informed the jury that to convict Gleason of first-degree murder it must find "such killing was done with premeditation."

In conclusion, whether standing alone or read in conjunction with the elements instructions, the aiding and abetting instruction given in this case correctly stated the law on aiding and abetting. Further, the instructions as a whole sufficiently conveyed to the jury that in order to find Gleason guilty of capital murder, the jury had to find Gleason premeditated and intended both Wornkey's and Martinez' murders.

*The district court did not err in denying Gleason's request for an instruction on felony murder as a lesser included offense of capital murder.*

Gleason requested an instruction on felony murder as a lesser included offense of capital murder, arguing there was some evidence to support the instruction under K.S.A. 21-3107(2)(a). The district court denied his request, and on appeal Gleason challenges that denial, arguing the instruction was both factually and legally appropriate.

### Standard of Review

Because Gleason requested a felony-murder instruction, we apply an unlimited review to determine whether the instruction would have been legally appropriate. If so, we next consider whether the evidence, when viewed in the light most favorable to the requesting party, was sufficient to support the instruction. Finally, if the district court erroneously refused to give the instruction, we determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*A felony-murder instruction would not have been legally appropriate because felony murder is not a lesser included offense of capital murder.*

A trial court must give a lesser included offense instruction when " 'there is some evidence which would reasonably justify a conviction of some lesser included crime' " as defined in K.S.A. 21-3107(2). K.S.A. 22-3414(3); *Plummer*, 295 Kan. at 161.

At the time of oral argument in this case, our caselaw supported Gleason's position that a felony-murder instruction would have been legally appropriate. See *State v. Cheever*, 295 Kan. 229, 259, 284 P.3d 1007 (2012) (holding, as a matter of first impression, that "felony murder is a lesser included crime of capital murder" under K.S.A. 2011 Supp. 21-5109[b][1] because felony murder is a lesser degree of homicide than capital murder), *reversed in part on other grounds by Kansas v. Cheever*, 134 S. Ct. 596 (2013).

But while Gleason's appeal was pending, the legislature amended K.S.A. 2012 Supp. 21-5402 to explicitly provide that K.S.A. 2013 Supp. 21-5109 (defining lesser included crimes) is not applicable to felony murder and felony murder is *not* a lesser included offense of capital murder. K.S.A. 2013 Supp. 21-5402(d). Additionally, the legislature declared the 2013 amendments to K.S.A. 2012 Supp. 21-5402 "establish a procedural rule for the conduct of criminal prosecutions and shall be construed and applied retroactively to all cases currently pending." K.S.A. 2013 Supp. 21-5402(e).

Given the significance of these legislative amendments to Gleason's alleged instruction error, we granted the State's unopposed motion to file a supplemental brief addressing the amendments' applicability to this case. In its supplemental brief, the State argues the 2013 amendments to K.S.A. 2012 Supp. 21-5402 foreclose Gleason's argument since the amendments apply retroactively to cases pending on appeal and exclude felony murder as a lesser included offense of capital murder. Gleason, on the other hand, argues the statute as amended is unconstitutional because it violates capital murder defendants' rights to due process as interpreted in *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L.

Ed. 2d 392 (1980), and because retroactive application of the statute in his case violates the constitutional prohibition against ex post facto laws.

Generally, statutes operate prospectively unless clear legislative language indicates otherwise. *State v. Wells*, 297 Kan. 741, 761, 305 P.3d 568 (2013) (citing *State v. Martin*, 270 Kan. 603, 608-09, 17 P.3d 344 [2001]). Here, the legislature clearly expressed its intent to retroactively apply K.S.A. 2013 Supp. 21-5402. Nevertheless, we must consider Gleason's argument that the statute, as amended, is unconstitutional and that its retroactive application would violate the prohibition against ex post facto laws. See *State v. Todd*, 299 Kan. 263, 323 P.3d 829, 839 (2014) (noting legislative authority to declare statute retroactive is not unlimited because "neither the statute itself nor its retroactive application may offend the federal or state Constitutions"); see also *State v. Barnes*, 278 Kan. 121, 129, 92 P.3d 578 (2004) (noting ex post facto limitations on retroactive legislation even when legislative intent is clear).

*The 2013 amendment excluding felony murder as a lesser included offense of capital murder does not violate capital defendants' due process rights.*

Relying on *Beck*, Gleason contends a defendant facing a death sentence is constitutionally entitled to a lesser included offense instruction on felony murder as an alternative to capital murder when the evidence supports such a verdict. Further, he argues this application of *Beck* renders K.S.A. 2013 Supp. 21-5402 unconstitutional. But Gleason misstates and misapplies *Beck*'s holding.

In *Beck*, the United States Supreme Court held that imposition of the death penalty violated the defendant's due process rights when " 'the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense, and when the evidence would have supported such a verdict.' " 447 U.S. at 627. But the constitutional violation in *Beck* arose from unique provisions of Alabama law which prohibited giving any lesser included offense instructions in capital cases and required a jury to impose the death penalty upon conviction of a capital offense. Thus, at the time of Beck's conviction, Alabama law gave capital juries two options: (1) find

the defendant guilty of a capital offense and impose the death penalty, or (2) find the defendant not guilty. 447 U.S. at 628-29. In concluding the death penalty could not be imposed under these circumstances, the *Beck* Court reasoned:

"[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." 447 U.S. at 637.

The Supreme Court subsequently clarified in *Hopkins v. Reeves*, 524 U.S. 88, 96, 118 S. Ct. 1895, 141 L. Ed. 2d 76, *reh. denied* 524 U.S. 968 (1998), that it had premised its finding of a due process violation in *Beck* on Alabama's preclusion of *all* lesser included offense instructions in capital cases even though such instructions generally were given in noncapital cases. The Court reasoned: "Alabama thus erected an 'artificial barrier' that restricted its juries to a choice between conviction for a capital offense and acquittal." 524 U.S. at 96.

But the Kansas Legislature's exclusion of felony murder as a lesser included offense of capital murder did not generate the same "all-or-nothing" situation for Kansas juries deciding whether to impose the death penalty. Unlike the Alabama law at issue in *Beck*, K.S.A. 2013 Supp. 21-5402(d) does not prohibit a trial court from giving other lesser included offense instructions in capital murder cases. For example, the trial court here instructed the jury it could find Gleason guilty of (1) capital murder for killing Wornkey and Martinez, (2) first-degree premeditated murder for killing Martinez, (3) second-degree intentional murder for killing Martinez, or (4) not guilty. Even under K.S.A. 2013 Supp. 21-5402(d), these same lesser included offense instructions would be legally appropriate in a capital murder case.

Our understanding of *Beck* is buttressed by *Schad v. Arizona*, 501 U.S. 624, 645-48, 111 S. Ct. 2491, 115 L. Ed. 2d 555, *reh. denied* 501 U.S. 1277 (1991). There, the Court emphasized that because the defendant's jury was not faced with an "all-or-nothing choice between the offense of conviction (capital murder) and innocence," the "central concern of *Beck*" was not implicated. 501

U.S. at 647; see also *Spaziano v. Florida,* 468 U.S. 447, 455, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984) ("The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.").

The *Schad* Court concluded the trial court's refusal to instruct the jury on every lesser included noncapital offense supported by the evidence did not violate the defendant's due process rights, reasoning, in part, that

"the fact that the jury's 'third option' was second-degree murder rather than robbery does not diminish the reliability of the jury's capital murder verdict. To accept the contention advanced by petitioner and the dissent, we would have to assume that a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets. Because we can see no basis to assume such irrationality, we are satisfied that the second-degree murder instruction in this case sufficed to ensure the verdict's reliability." 501 U.S. at 647-48.

Similarly, we will not assume here that the jury, unconvinced of Gleason's guilt of capital murder, first-degree premeditated murder, or second-degree intentional murder "but loath to acquit him completely" (because the jury was convinced that he was guilty of felony murder), might have chosen the capital offense as its means of holding Gleason accountable for Martinez' murder.

We therefore reject Gleason's due process challenge to K.S.A. 2013 Supp. 21-5402 and conclude the district court did not err in denying Gleason's request for a felony-murder instruction.

*Applying the amended statute to Gleason does not violate the prohibition against ex post facto laws.*

Alternatively, Gleason asserts that retroactive application of K.S.A. 2013 Supp. 21-5402 violates the prohibition against ex post facto laws. See U.S. Const. art. 1, § 9 ("No Bill of Attainder or ex post facto Law shall be passed."); U.S. Const. art. 1, § 10 ("No State shall . . . pass any . . . ex post facto Law.").

We have held that a law is ex post facto if two critical elements are present: (1) The law is retrospective, and (2) the law disadvan-

tages the offender affected by it. *State v. Jaben*, 294 Kan. 607, 612, 277 P.3d 417 (2012); *State v. Cook*, 286 Kan. 766, 770, 187 P.3d 1283 (2008) (quoting *Weaver v. Graham*, 450 U.S. 24, 29, 101 S. Ct. 960, 67 L. Ed. 2d 17 [1981]). Gleason claims both elements are present here.

Given the Kansas Legislature's clearly expressed intent for retroactive application of K.S.A. 2013 Supp. 21-5402, we need only consider the second element of the test stated above—*i.e.*, whether the law "disadvantages" Gleason. See K.S.A. 2013 Supp. 21-5402(e) ("The amendments to this section by this act . . . shall be construed and applied retroactively to all cases currently pending.").

We recently clarified that "retroactively applied legislation that simply 'alters the situation of a party to his disadvantage' does not, in and of itself, violate the Ex Post Facto Clause. The disadvantage, to be unconstitutional under the Clause, must fall within one of the categories recognized in *Beazell* [*v. Ohio,* 269 U.S. 167, 46 S. Ct. 68, 70 L. Ed. 216 (1925)]." *Todd*, 299 Kan. at 277. As identified in *Beazell*, those categories are:

" ' "[A]ny statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*." ' " *Todd*, 299 Kan. at 277 (quoting *Beazell*, 269 U.S. at 169-70).

As the State points out, the amendments in K.S.A. 2013 Supp. 21-5402 excluding felony murder as a lesser included offense of capital murder do not fit within any of these categories. Consequently, retroactive application of K.S.A. 2013 Supp. 21-5402 does not violate the Ex Post Facto Clause. See *Todd*, 299 Kan. at 277 (concluding K.S.A. 2013 Supp. 21-5402[d] could be applied retroactively without violating Ex Post Facto Clause).

K.S.A. 2013 Supp. 21-5402(d), by its express language, applies retroactively, foreclosing Gleason's claim that the district court erred in refusing Gleason's request for a felony-murder instruction. Further, the 2013 amendments do not violate Gleason's constitutional right to due process, as interpreted in *Beck*, nor does ret-

roactive application violate the prohibition against ex post facto laws.

## CHALLENGES TO ALL CONVICTIONS

We have rejected Gleason's claims that errors specific to his capital murder conviction require reversal of that conviction. Next, we address Gleason's claims that all of his convictions must be reversed because (1) the district court violated his constitutional right to confront the witnesses against him by declaring Thompson unavailable and admitting Thompson's preliminary hearing testimony, (2) the district court failed to grant a mistrial after Thompson refused to testify, (3) the prosecutor committed misconduct during closing argument, (4) the district court erred in instructing the jury that "[a]nother trial would be a burden on both sides," and (5) the cumulative effect of guilt-phase errors deprived him of a fair trial.

### Issues Related to Thompson's Refusal to Testify at Trial

Gleason asserts the district court violated his confrontation rights under the Sixth Amendment to the United States Constitution, § 10 of the Kansas Constitution Bill of Rights, and statutory rules of evidence by declaring Thompson an unavailable witness and admitting Thompson's preliminary hearing testimony after Thompson refused to testify at trial. Further, Gleason argues the district court abused its discretion in failing to grant a mistrial after Thompson refused to testify. We separately address Gleason's challenges to the district court's confrontation and mistrial rulings after setting forth the following facts that are relevant to both challenges.

### Additional facts regarding Thompson's refusal to testify

During opening statements, counsel for both parties indicated Thompson would testify. At one point, the prosecutor discussed Thompson's plea deal and emphasized that Thompson was required to and would "appear on that witness stand. It's part of his deal. He's required to testify truthfully, and so you'll get to look at him just like you look at [Gleason]."

When called as the State's last witness, Thompson answered the prosecutor's preliminary questions about his age, his current im-

prisonment, his address at the time of the double homicide, and his relationship to Gleason. But when asked to identify Gleason in court, Thompson refused to do so and refused to further testify, stating he had previously "came forward with the truth." At the prosecutor's request, the district court ordered Thompson to answer questions, but Thompson maintained his refusal. The prosecutor then asked the court to direct Thompson to "answer on pain of contempt," and defense counsel requested a bench conference.

The court conducted a brief, off-the-record discussion before recessing for lunch and contacting Thompson's defense attorney, Val Wachtel. At the court's request, Wachtel drove from Wichita to the proceedings in Great Bend. After Wachtel arrived, the court resumed the proceedings outside the presence of the jury. Wachtel advised the court that he had spoken with Thompson about the potential consequences of his refusal to testify in light of his plea agreement. Specifically, Wachtel stated:

"I have told him that he exposes himself to at least the possibility that the State of Kansas may choose to attempt to set aside his plea, set aside his plea agreement, set aside his plea, and set aside his sentence and proceed against him as a capital homicide case."

Wachtel further informed the court that Thompson did "not want to be involved in assisting either side in telling their version of the truth" and that Thompson fully understood that his refusal to testify could result in a contempt finding. The following discussion then occurred:

"[Prosecutor]: Your honor, I ask that the Court order the witness to testify.

"THE COURT: Mr. Thompson, you were here this morning, and you have heard the statement that Mr. Wachtel has made to the Court, and we are ready to proceed this afternoon with—with your questioning, and since you refused to answer this morning, I am going to order you to answer the questions that will be posed by the State and by defense to you. Do you understand that?

"THE WITNESS [Thompson]: Yes, ma'am.

"THE COURT: Okay, and will you do that?

"THE WITNESS: I decline.

"THE COURT: Okay.

"[Prosecutor]: Your Honor, at this time, the Court can, if it chooses to do so, hold Mr. Thompson in direct contempt.

"THE COURT: I am going to hold him in contempt, but counsel knows that holding Mr. Thompson in contempt is meaningless at this point. He is serving a life sentence. My—obviously, the penalty that I can impose is nonexistent as far as he's concerned. So I am going to hold him in contempt, and you may proceed.

"[Prosecutor]: I think you ought to excuse the witness, Judge, and he can depart the court.

"[Defense counsel]: Your Honor, I think you have held him in contempt, and I understand, for the Court's saying given a life sentence, but there are some impacts. It's going to—potentially, it's going to affect the parole board when he sees the parole board in 25 years. I'm sorry. Granted, that's a way down the road. We think he's done that. I think you have to give him time to purge himself of the contempt before we can proceed."

In response to defense counsel's request that Thompson be given an opportunity to purge himself of the contempt, the prosecutor argued the State had sufficiently established Thompson's refusal to testify, particularly considering Wachtel's consultation with Thompson and Thompson's continued refusal to answer questions. Nevertheless, defense counsel suggested Thompson be permitted to reconsider his position overnight. The court declined, noting Thompson was already in jail so putting him in jail with an opportunity to purge the contempt was "meaningless."

Next, the court granted the prosecutor's request to declare Thompson unavailable. Defense counsel responded by immediately moving for a mistrial, noting that the court had admitted several of Thompson's hearsay statements under K.S.A. 60-460(a) based on the assumption Thompson would be available for cross-examination. Defense counsel argued Thompson's refusal to testify and the court's finding that Thompson was unavailable rendered these hearsay statements inadmissible. Later, defense counsel narrowed the basis of the mistrial motion to the hearsay statements attributable to Thompson admitted through Agent Latham's testimony.

Defense counsel further objected to what he characterized as a "separate issue"— the State's anticipated admission of Thompson's preliminary hearing testimony—and argued it would not adequately protect Gleason's confrontation rights. The prosecutor maintained that only one issue was before the court and argued

Gleason's cross-examination of Thompson at the preliminary hearing adequately protected Gleason's confrontation rights.

After hearing oral arguments from both parties, the district court released the jury early. The next morning, the court immediately advised the jury that the court would need time to address a legal issue and that because it was Good Friday, the courthouse would close at noon. The court then released the jury until the following Monday. On Saturday, the State filed a written response to Gleason's oral motion for mistrial.

On Monday, the district court advised the parties outside the presence of the jury that over the weekend it had received and considered the State's written motion. The court then heard additional oral arguments from both parties before denying Gleason's motion for mistrial. Ultimately, the court concluded the admission of Thompson's hearsay statements through Agent Latham did not violate Gleason's confrontation rights because, based on the court's own review of the preliminary hearing transcript, Gleason had cross-examined Thompson about the substance of those statements at the preliminary hearing. The court cited *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), for support. Further, the court ruled it would admit Thompson's preliminary hearing testimony, reasoning *Crawford* was satisfied because Thompson was unavailable as a witness and Gleason had extensively cross-examined Thompson at the preliminary hearing. Finally, over Gleason's objection, the district court instructed the jury as requested by the State:

"You're about to hear the reading of testimony of a witness taken under oath at another time and place. It is to be weighed by the same standards as other testimony. So even though Mr. Thompson now does not testify, you are to pay close attention to the testimony that you hear from the reading of that testimony. Okay, and then consider it just the same as if Mr. Thompson was sitting here and testifying in person."

The State then proceeded to read Thompson's entire preliminary hearing testimony into the record, with the prosecutor reading his questions and Agent Latham reading Thompson's responses. After Latham left the witness stand defense counsel clarified: "So the record is clear, Judge, there's no opportunity for me to ask any

questions." The court responded: "Not at this time, no." After presenting Thompson's preliminary hearing testimony, the State rested.

*The district court did not violate Gleason's confrontation rights by declaring Thompson unavailable and admitting his preliminary hearing testimony.*

Gleason first challenges the district court's admission of Thompson's preliminary hearing testimony, arguing the district court erred in finding Thompson unavailable and in finding Thompson's prior cross-examination adequate to protect Gleason's confrontation rights.

To protect a defendant's constitutional confrontation rights, testimonial hearsay is inadmissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford,* 541 U.S. at 68; see also *State v. Robinson,* 293 Kan. 1002, 1024, 270 P.3d 1183 (2012) (discussing *Crawford*).

Initially, the State concedes Gleason correctly characterizes Thompson's preliminary hearing testimony as testimonial. See *Crawford,* 541 U.S. at 68 (acknowledging that testimonial hearsay includes prior testimony given by witness at preliminary hearing). Further, the parties agree that the admission of testimonial hearsay implicates the Confrontation Clause of the Sixth Amendment to the United States Constitution. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). See Kan. Const. Bill of Rights, § 10 (providing criminal defendants with right to "meet the witness face to face").

Gleason contends, however, that Thompson's preliminary hearing testimony was inadmissible because the State failed to establish Thompson's unavailability or that Gleason had an opportunity to adequately cross-examine Thompson, as required by *Crawford.*

a. *The district court did not err in finding Thompson unavailable.*

Gleason argues the district court erred as a matter of law in declaring Thompson unavailable because the court ignored controlling precedent providing that a witness who is present but refuses to testify is not unavailable. Alternatively, Gleason argues the district court erred in declaring Thompson unavailable, because the prosecutor did not act with reasonable diligence to procure Thompson's testimony at trial.

The State contends Gleason's adamant refusal to testify rendered him unavailable as that term has been interpreted by this court in the context of the Sixth Amendment right to confrontation and in the context of K.S.A. 60-459(g):

" 'Unavailable as a witness' includes situations where the witness is (1) exempted on the ground of privilege from testifying concerning the matter to which his or her statement is relevant, or (2) disqualified from testifying to the matter, or (3) unable to be present or to testify at the hearing because of death or then existing physical or mental illness, or (4) absent beyond the jurisdiction of the court to compel appearance by its process, or (5) absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her whereabouts."

Gleason argues the controlling precedent at the time of his trial in 2006 was *State v. Johnson-Howell*, 255 Kan. 928, 881 P.2d 1288 (1994), *overruled by State v. Jefferson*, 287 Kan. 28, 194 P.3d 557 (2008). In *Johnson-Howell*, the defendant claimed the district court's admission of hearsay statements of a codefendant who refused to testify violated her confrontation rights. The court analyzed the claim under both Kansas hearsay statutes and the Sixth Amendment and held that a nontestifying codefendant who was present at trial but refused to testify without asserting any valid privilege was not "unavailable" as defined in K.S.A. 60-459(g). 255 Kan. at 934-44. The court further concluded for Sixth Amendment purposes "[a] witness' refusal to testify in a criminal case is not a recognized ground for unavailability of the witness in this state." 255 Kan. at 940.

Significantly, Gleason fails to point out that this court clarified in *Jefferson* that *Johnson-Howell* was wrong on both points. In *Jef-*

*ferson*, this court interpreted the list of situations in K.S.A. 60-459(g) as exemplary rather than exclusive and held that a witness who refuses to testify after being ordered to do so by the court is an unavailable witness under K.S.A. 60-459(g). *Jefferson*, 287 Kan. at 37-38. In doing so, the *Jefferson* court found several flaws in *Johnson-Howell*'s analysis of whether the witness was unavailable under K.S.A. 60-459(g).

Further, the *Jefferson* court noted that although *Johnson-Howell*'s conclusions regarding unavailability of a witness conflicted with this court's prior decision in *State v. Terry*, 202 Kan. 599, 451 P.2d 211 (1969), *Johnson-Howell* did not overrule *Terry*. *Jefferson*, 287 Kan. at 36-37. The *Jefferson* court further noted its interpretation of K.S.A. 60-459(g) was consistent with *Terry* and with federal rules of evidence. *Jefferson*, 287 Kan. at 36-38; see Fed. R. Evid. 804(a)(2) (defining unavailable witness, in part, as declarant who "refuses to testify about the subject matter despite a court order to do so"). In *Jefferson*, this court ultimately affirmed the district court's decisions to declare the witness unavailable when that witness refused to testify at trial and to admit that witness' preliminary hearing testimony under K.S.A. 60-460(c)(2)(B). 287 Kan. at 39.

Both parties proffer various arguments as to whether *Jefferson*, which was decided 2 years after the trial in this case and addressed the parameters of K.S.A. 60-459(g) rather than the Sixth Amendment right of confrontation, applies here. But we find it unnecessary to analyze these arguments because *Terry*, decided before the trial in this case, was not overruled by *Johnson-Howell* and is directly on point.

In *Terry*, this court recognized that "[t]he basic and primary reason underlying the constitutional 'confrontation' rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him." 202 Kan. at 601 (citing *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 [1965]). The court further recognized an exception to the confrontation requirement "where a witness is unavailable and has given testimony at a previous judicial proceeding against the same defendant which was subject to cross-examination by that defendant." *Terry*, 202 Kan.

at 601. The court explained that, in that situation, the prior testimony of such witness may be introduced at the subsequent proceeding because "the right of cross-examination initially afforded provides substantial compliance with the purposes behind the confrontation requirement." 202 Kan. at 602.

Applying these principles, the *Terry* court determined two witnesses, who had been granted immunity and who had testified and been subjected to extensive cross-examination at the defendant's preliminary hearing but who "flatly refused to testify" at the defendant's trial, were "just as 'unavailable' as though [their] physical presence could not have been procured." 202 Kan. at 603. Thus, the court concluded the defendant's confrontation rights were not violated by the admission of the witnesses' prior testimony. 202 Kan. at 603.

*Terry* controls this issue and remained good law at the time of Gleason's trial. And, although *Terry* was decided several decades before *Crawford*, *Terry*'s analysis is consistent with *Crawford* and with decisions from other jurisdictions. See Annot., 92 A.L.R.3d 1138 (gathering cases regarding unavailability of witness who is present in court but refuses to testify without claiming a valid privilege). Finally, while the district court did not have *Jefferson*'s guidance at Gleason's trial, it appears the district court did consider *Terry*. Accordingly, we affirm the district court's determination that Thompson's refusal to testify rendered him unavailable.

b. *The prosecutor made reasonable efforts to procure Thompson's live testimony.*

Alternatively, Gleason argues the district court erred in declaring Thompson unavailable because, under the facts of this case, the prosecutor failed to make reasonable efforts to compel Thompson to testify at trial. Specifically, Gleason contends the State should have sought a continuance to give Thompson time to change his mind about testifying as well as to consider possible contempt sanctions or withdrawal of Thompson's plea contract. Gleason also suggests the court should have imposed contempt sanctions against Thompson.

The State, on the other hand, contends it exhausted all possible means of compelling Thompson to testify. Relying on *Jefferson* and *Terry*, the State argues the prosecutor and court took reasonable measures to compel Thompson to testify under these circumstances, including holding him in contempt after giving him the opportunity to consult with counsel who verified that Thompson fully understood all the potential repercussions of refusing to testify.

Although the prosecutor here obtained Thompson's presence at trial, Gleason relies on a line of cases concerning "absent witnesses," including *State v. Washington*, 206 Kan. 336, 338, 479 P.2d 833 (1971), where this court held:

"Under the federal constitutional standard as applied to the states, the test of unavailability, for the purposes of the exception to the confrontation requirement, is whether the prosecutorial authorities have made a 'good faith effort' to obtain the witness's presence at trial [citation omitted]. Consistent with the federal mandate is our long-standing rule that before the state may use the testimony of an absent witness given at a former trial or preliminary hearing, it must be made to appear the witness cannot, by the exercise of reasonable diligence, be produced at trial [citations omitted]."

See also *State v. Flournoy*, 272 Kan. 784, 799-802, 36 P.3d 273 (2001) (applying the "good-faith" standard when State failed to produce witness at trial); *State v. Zamora*, 263 Kan. 340, 342-48, 949 P.2d 621 (1997) (same). Ultimately, whether a prosecutor has made sufficient effort to secure the testimony of an unavailable witness is a question of reasonableness. *Hardy v. Cross*, 565 U.S. ___, 132 S. Ct. 490, 494, 181 L. Ed. 2d 468 (2011) (citing *California v. Green*, 399 U.S. 149, 189 n.22, 90 S. Ct. 1930, 26 L. Ed. 2d 489 [1970] [Harlan, J., concurring]).

Notably, in *Jefferson* and *Terry*, the court did not discuss the "good-faith" standard in considering the witness' unavailability. In those cases, like this case, the State produced the defendant but the defendant refused to testify. But some courts have applied the good-faith standard to similar facts. See, *e.g.*, *Lowery v. Anderson*, 225 F.3d 833, 839-40 (7th Cir. 2000) (discussing unavailability of physically present witness who refused to testify and noting reasonableness of prosecutorial efforts required consideration of

whether prosecution "made a good-faith effort to obtain the witness' testimony, in person, before the trier of fact"), *superseded by statute on other grounds Corcoran v. Buss*, 551 F.3d 703 (7th Cir. 2008), *cert. granted, judgment vacated, and remanded by Corcoran v. Levenhagen*, 558 U.S. 1, 130 S. Ct. 8, 175 L. Ed. 2d 1 (2009); see also 2 McCormick on Evidence § 253, p. 168 n.11 (6th ed. 2006) ("When the testimony is being offered against the criminal defendant, the Confrontation Clause requires good faith efforts to obtain the testimony of a physically available but unwilling person.").

The facts of this case are quite similar to those in *Lowery*. There, Lowery and his accomplice, Bennett, robbed and killed an elderly couple. Bennett testified at Lowery's first trial, pursuant to a plea agreement and in exchange for a guaranteed prison sentence of 40 years. Lowery was convicted of both murders but successfully appealed, obtaining a new trial.

Before Lowery's second trial, Bennett informed the State he would refuse to testify unless the State agreed to reduce his sentence. The State refused and transported Bennett from state prison so he could testify at the second trial. Outside the presence of the jury, Bennett refused to testify after being ordered to do so by the court, and the court held him in contempt. The next day, the court repeated the same procedure with the same result, and the court ultimately found Bennett to be an unavailable witness and admitted his testimony from the first trial. Lowery claimed this practice violated his confrontation rights, arguing "Bennett was not truly 'unavailable' because the State failed to exhaust other means which might have induced Bennett to testify." 225 F.3d at 839. The *Lowery* panel disagreed, stating:

"Although the record is silent as to why the prosecution chose not to threaten Bennett with further prosecution or charge him with a crime, there is no requirement to do so and such decisions are well within the prosecution's discretion. [Citations omitted.] We decline to impose a rule imposing the court's will upon the prosecution and we fear that to do so would violate the separation of powers." 225 F.3d at 840.

The *Lowery* panel ultimately concluded the prosecutor acted reasonably in attempting to procure Bennett's presence and testimony at trial. 225 F.3d at 840.

Similarly, in this case, Thompson testified against Gleason at the preliminary hearing, and in exchange the State agreed not to seek a capital sentence. At trial, Thompson took the witness stand and answered preliminary questions. When Thompson refused to continue testifying, the court ordered him to answer questions. Based on his continued refusal, the court recessed and contacted Thompson's attorney, Val Wachtel. The court remained in recess while Wachtel drove from Wichita to Great Bend and consulted with Thompson. When the proceedings resumed, Wachtel advised the court that Thompson refused to testify with full knowledge of the potential consequences, including the possibility the State might seek to revoke Thompson's plea agreement, move to set aside his plea and sentence, and pursue a capital charge and seek the death penalty against Thompson. The court confirmed Wachtel's representations with Thompson, again ordered him to testify, and held him in contempt when he refused. However, the court declined to impose contempt sanctions, reasoning that it would be "meaningless" to place Thompson in jail for any length of time given Thompson was already serving a life sentence.

Notably, the prosecutor's and the court's efforts in this case to compel Thompson's testimony exceed the actions taken to compel recalcitrant witnesses' testimony in other Kansas cases. For instance in *Jefferson* and *Terry*, the prosecutor's actions were found to be reasonable although there is no evidence that the unwilling witnesses in those cases consulted with counsel or that counsel verified after consultation that the witnesses refused to speak despite knowing the consequences of that refusal. See *Jefferson*, 287 Kan. at 30 (prosecutor subpoenaed incarcerated witness to testify at trial and witness appeared but refused to testify after consultation with counsel; court held witness in contempt and sentenced him to 6 months in jail); *Terry*, 202 Kan. at 603 (prosecutor secured presence of two incarcerated witnesses at trial and both refused to testify despite being granted immunity); see also, *e.g.*, *Gregory v. Shelby County, Tenn.*, 220 F.3d 433, 449 (6th Cir. 2000) (trial court failed to order unwilling witness to testify before declaring witness unavailable, but court found failure was harmless because judicial pressure to testify would have been unavailing when witness al-

ready serving life sentence), *abrogated in part on other grounds by Buckhannon Board & Care Home v. W. Va. Dept. of H.H.R.*, 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001); 2 McCormick on Evidence § 253, p. 168 n.11 (6th ed. 2006) ("Reasonable efforts obviously include a judicial order to testify and holding the recalcitrant witness in contempt. Whether the Confrontation Clause requires more is unclear.").

Finally, we reject Gleason's assertion that, at the very least, the court should have given Thompson an overnight opportunity to further consider his refusal to testify. In light of the lengthy term of Thompson's incarceration, his consultation with his counsel, and his adamant refusal to testify despite knowing the potential implications and repercussions of that refusal, including a possible death sentence, we can discern no reason to require the prosecutor to seek an overnight delay.

Considering the totality of these circumstances, we conclude Thompson's adamant refusal to testify rendered him unavailable under *Terry* and K.S.A. 60-459(g) and the prosecutor's efforts to compel Thompson's live testimony at trial were reasonable under the circumstances. Consequently, we affirm the district court's determination that Thompson was unavailable.

### c. *Gleason had an adequate prior opportunity to cross-examine Thompson.*

Gleason also suggests the district court erroneously concluded he had an adequate prior opportunity to cross-examine Thompson.

While "*Crawford* requires an opportunity for cross-examination before hearsay can be admitted, it provides no guidance for how much cross-examination is required to afford the defendant an adequate opportunity." *State v. Noah*, 284 Kan. 608, 612-13, 162 P.3d 799 (2007). Each case involving the admission of an unavailable witness' preliminary hearing testimony must be considered on its own particular facts. 284 Kan. at 615, 617.

It is undisputed that defense counsel extensively cross-examined Thompson at the preliminary hearing. But Gleason argues his prior cross-examination of Thompson was inadequate to protect his confrontation rights because: (1) Other states have recognized that

preliminary hearings are too dissimilar from trials to permit adequate cross-examination, (2) substantial investigation occurred between the preliminary hearing and trial and new information was discovered, and (3) a defendant does not have the same motive to explore witness credibility at a preliminary hearing. As the State points out, we have previously rejected these same arguments as a basis for finding a full cross-examination conducted at a preliminary hearing is inadequate to satisfy *Crawford*. See *State v. Stano*, 284 Kan. 126, 142-45, 159 P.3d 931 (2007). Gleason fails to distinguish *Stano* on its facts or to offer any persuasive arguments as to why we should reconsider our conclusions from *Stano*.

Alternatively, Gleason compares the facts of this case to those in *Noah* and argues "[b]ecause the defense was not able to cross-examine Thompson about his in-court statements, Mr. Gleason did not have a full and fair opportunity to cross-examine the witness" and all of his prior statements, including his preliminary hearing testimony, should have been excluded. But Gleason's attempt to equate the facts of this case with those in *Noah* is unavailing.

In *Noah*, a child victim testified on direct examination at the preliminary hearing and answered several questions on cross-examination before becoming too emotional to continue. Consequently, defense counsel could not complete his cross-examination of the child victim at the preliminary hearing. The district court declared the child victim unavailable at trial and allowed the State to introduce the victim's prior statements to her mother, brother, and social worker. This court concluded in *Noah* that the defendant had been denied an adequate opportunity for cross-examination due to the victim's inability to continue testifying *at the preliminary hearing* and thus her prior testimonial hearsay statements to others were inadmissible under *Crawford*. We further concluded, under the particular facts of that case, that the erroneous admission of the victim's hearsay statements was not harmless. *Noah*, 284 Kan. at 617-19.

Here, unlike in *Noah*, Gleason does not suggest he was unable to fully cross-examine Thompson at the preliminary hearing. And the facts demonstrate he was able to do so as Thompson testified on direct examination at the preliminary hearing and defense coun-

sel extensively and fully cross-examined him. Further, the trial court admitted Thompson's preliminary hearing testimony in its entirety at trial.

Instead, Gleason contends the court limited his ability to cross-examine Thompson at trial when Thompson refused to respond to further questions after answering several preliminary questions on direct examination regarding his age, the reason for his imprisonment, his relationship to Gleason, and the fact he had entered into a plea agreement; and advised the court he previously "came forward with the truth."

Gleason argues that because he was unable to cross-examine Thompson about his in-court comments, all of his prior statements, including those subjected to extensive cross-examination at the preliminary hearing, should have been excluded. We disagree. Simply stated, Gleason's inability to question Thompson about his in-court comments did not render his cross-examination of Thompson at the preliminary hearing inadequate under *Crawford*. And, as the State points out, the questions Thompson answered before he refused to continue testifying—questions not subject to cross-examination—did not lend themselves to cross-examination. Instead, his comments consisted of background information and nonresponsive remarks, rather than testimony about the underlying facts of the crimes charged.

As such, the facts of this case are clearly distinguishable from the facts in *Noah*, and we conclude Gleason had an adequate prior opportunity to cross-examine Thompson as required by *Crawford*.

## Conclusion

Under the facts of this case, the district court correctly concluded Thompson's refusal to testify at trial rendered him unavailable. Further, we find the prosecutor's efforts to procure Thompson's testimony at trial were reasonable under the circumstances and Gleason had a prior adequate opportunity to cross-examine Thompson at the preliminary hearing. Accordingly, we hold the district court's actions did not violate Gleason's confrontation rights, and we affirm the district court's decision to admit Thompson's preliminary hearing testimony.

*The district court did not abuse its discretion in failing to declare a mistrial.*

In a separate but related argument, Gleason claims the district court abused its discretion in denying his motion for a mistrial. Gleason initially sought a mistrial because "several hearsay statements of Mr. Thompson elicited by numerous witnesses" had been introduced under the hearsay exception of K.S.A. 60-460(a) based on the assumption that Thompson would testify at trial and be available for cross-examination. See K.S.A. 60-460(a) (rendering prior hearsay statements admissible if declarant "is present at the hearing and available for cross-examination with respect to the statement and its subject matter"). Before the district court ruled on the motion, Gleason narrowed the basis of his motion to the hearsay statements attributable to Thompson that came in through Agent Latham's testimony. The district court ultimately concluded the admission of those particular hearsay statements did not violate Gleason's confrontation rights, because Gleason had cross-examined Thompson at the preliminary hearing about the underlying facts of the double homicide.

A trial court may declare a mistrial if there is prejudicial conduct, either inside or outside the courtroom, that makes it impossible for the trial to proceed without injustice to the defendant or the prosecution. K.S.A. 22-3423(1). In considering a motion for mistrial, the trial court must first determine if there was some fundamental failure of the proceeding. If so, the court must then determine whether it is possible to continue the proceeding without injustice. The second determination requires the court to "decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. [Citations omitted.]" *State v. Harris*, 293 Kan. 798, 814, 269 P.3d 820 (2012). We review both determinations made by the district court for an abuse of discretion. *Harris*, 293 Kan. at 814-15 (citing *State v. Ward*, 292 Kan. 541, 551, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]).

Based on the evolution of Gleason's arguments, we find lengthy analysis of this issue unnecessary. As noted, Gleason narrowed the

basis for his mistrial motion to Thompson's postarrest interview statements to Agent Latham—statements Latham then testified about at trial. Even though Gleason challenged the admissibility of these statements under K.S.A. 60-460(a), Thompson's statements to Agent Latham, like his preliminary hearing testimony, are testimonial hearsay statements and their admissibility is governed by *Crawford* rather than statutory hearsay exceptions. See *State v. Bennington*, 293 Kan. 503, 508-16, 264 P.3d 440 (2011) (clarifying that statements made during police interrogations are testimonial when primary purpose of interrogation is to establish or prove past events potentially relevant to later criminal prosecutions); *State v. Robinson*, 293 Kan. 1002, 1024, 270 P.3d 1183 (2012) (noting *Crawford* governs admissibility of testimonial hearsay while statutory hearsay exceptions govern admissibility of nontestimonial hearsay).

Because we have already concluded Thompson was unavailable and Gleason had an adequate opportunity to cross-examine Thompson at the preliminary hearing, and because the substance of Thompson's statements to Latham were consistent with the substance of Thompson's preliminary hearing testimony, we affirm the district court's denial of Gleason's motion for a mistrial based on the admission of these statements.

*The prosecutor did not commit misconduct during closing argument.*

Next, Gleason argues the prosecutor misstated the law or made improper comments on Thompson's credibility during closing argument. The State contends the challenged statements were proper when considered in context.

*Standard of Review*

When considering a claim of prosecutorial misconduct, we must determine whether the prosecutor's statements exceeded the wide latitude of language and manner afforded a prosecutor in making closing arguments. If the statements were improper, we must then determine whether the statements prejudiced the jury against the

defendant and denied the defendant a fair trial. *State v. Mc-Cullough*, 293 Kan. 970, 985, 270 P.3d 1142 (2012).

*Analysis*

Gleason takes issue with the prosecutor's statements that Thompson " 'refused to testify against his cousin, but he did tell you he told the truth before. *That's why you heard the testimony. That's why it got read to you.'* " Gleason contends the prosecutor misstated the law "by implying to the jury that the [district] court had made a finding that Thompson's testimony was truthful" and by suggesting the district court considered the truthfulness of Thompson's preliminary hearing testimony before admitting that testimony. Alternatively, Gleason asserts the prosecutor improperly commented on Thompson's credibility.

It is improper for a prosecutor to misstate the law. *State v. Burnett*, 293 Kan. 840, 850, 270 P.3d 1115 (2012) ("When a prosecutor deliberately misstates the controlling law, he or she steps outside the considerable latitude given prosecutors."). And it is further improper for a prosecutor to offer his or her personal opinion regarding the credibility of a witness. See *State v. Bridges*, 297 Kan. 989, 1013, 306 P.3d 244 (2013) (noting that a prosecutor's personal opinion of a witness' credibility constitutes unsworn, unchecked testimony and impinges upon jury's duty to determine truthfulness of witness); *State v. Marshall*, 294 Kan. 850, 857, 281 P.3d 1112 (2012) (noting general rule that prosecutor may not offer jury his or her personal opinion as to credibility of witness); see also Kansas Rules of Professional Conduct (KRPC) 3.4(e) (2013 Kan. Ct. R. Annot. 601) ("A lawyer shall not . . . in trial . . . state a personal opinion as to . . . the credibility of a witness.").

But, considering the prosecutor's statements in context, we conclude neither of these improprieties occurred here. See *Burnett*, 293 Kan. at 851 (noting allegedly improper comments must be considered in context of entire closing argument and in conjunction with jury instructions); *State v. Naputi*, 293 Kan. 55, 59, 260 P.3d 86 (2011) (recognizing that "reading comments in isolation can frequently be misleading as to the message that the prosecutor was conveying to the jury").

In the first portion of his closing argument, the prosecutor emphasized that Thompson's testimony was corroborated by physical evidence and the testimony of other witnesses. The prosecutor reminded the jury that Thompson's testimony did not come in as the State expected it would and stated:

"Damien Thompson did take the stand in this case. You saw him sit there. You saw how he acted. You saw—heard what he said, and when he refused to say any more, you were read his transcript. Ask you to remember one thing when you're thinking of Damien Thompson. What did he say when he was here? One of the things he said was that he had already told the truth. When did he tell that truth? Well, he had already had a previous statement, not just a statement, a direct examination, a cross-examination conducted by [defense counsel], a redirect examination. You heard it when it was read to you. It took more than an hour to read all that to you. You get to weigh that evidence. You get to weigh those statements."

Conversely, in his closing argument, defense counsel emphasized Thompson's lack of credibility. He began by stating, "The tricky thing in this case it seems to me is are you going to believe Damien Thompson or are you not?" He pointed out inconsistencies between Thompson's testimony and the testimony of other witnesses and within Thompson's own testimony, argued that Thompson was the driving force behind the crimes, and reminded the jury that Thompson had made a deal with the State to avoid the death penalty.

In rebuttal, the prosecutor stated:

"We spent a lot of time in that first part of closing statement talking about corroboration. Corroboration of [Thompson's] testimony from other witnesses, corroboration of evidence that had been seized in this case, evidence seized before Damien Thompson admits his guilt, evidence seized after Damien Thompson admits his guilt, evidence that corroborates the story. Damien Thompson said a lot of things in his testimony. He took that stand. Stopped talking, didn't he? In this courtroom when asked to testify against his cousin, he made a lot of statements. You saw his attitude. You saw his demeanor. You saw how he was acting. You saw how he acted towards his cousin, towards the prosecutor, towards the judge. *Refused to testify against his cousin, but he did tell you he told the truth before. That's why you heard the testimony. That's why it got read to you.*" (Emphasis added.)

As the State admits, when read in isolation the challenged statements, italicized above, appear problematic and could be inter-

preted to imply that the jury heard Thompson's prior testimony because Thompson told the jury he told the truth at the preliminary hearing. But when considered in context of the entire closing argument, the statements are not improper. Specifically, the prosecutor reminded the jury that it heard Thompson's refusal to testify, that other testimony corroborated Thompson's preliminary hearing testimony, and that it was the jury's duty to judge the credibility of the witnesses, including Thompson. Under these circumstances, we conclude the prosecutor's statements are more aptly characterized as an inartful attempt to explain to the jurors why they heard Thompson's prior testimony and to remind them that they were to treat Thompson's testimony the same as they would any other testimony and judge his credibility accordingly.

Because the statements were not improper, we reject Gleason's prosecutorial misconduct claim.

*The district court did not commit clear error in instructing the jury "another trial would be a burden on both sides."*

Citing *State v. Salts*, 288 Kan. 263, 200 P.3d 464 (2009), Gleason claims the district court committed reversible error by giving an *Allen*-type instruction that included the phrase "another trial would be a burden on both sides." See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

*Standard of Review*

Because Gleason objected on different grounds at the district court level, we will consider this alleged instruction error under the clear-error rule of K.S.A. 22-3414(3). See *Robinson*, 293 Kan. at 1036. First, we determine whether the instruction was erroneous. This is a legal question subject to de novo review. If we find error, reversal is required only if we are firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. We have unlimited review over the reversibility determination and must examine the record as a whole. Gleason bears the burden of establishing clear error. See *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 193 (2012).

*Analysis and Conclusion*

We previously have disapproved of the challenged language and easily conclude the instruction was erroneous. See *Salts*, 288 Kan. at 266-67. But, we reject Gleason's contention that this error constitutes "reversible error in a capital case because of the greater burdens associated with capital trials" and because the " 'burden' language is more easily seen as an appeal to the financial interests of taxpayers when the case they are to consider is a capital case."

As the State points out, we also previously have rejected a reversibility argument very similar to Gleason's argument here. See *Burnett*, 293 Kan. 840. In *Burnett*, the defendant argued the *Salts* error in his capital murder case required reversal because the jury was " 'likely to be very mindful of the increased litigation costs that go along with capital trials,' " and that the erroneous instruction " 'surely invoked concerns that a failure to reach a verdict would waste taxpayer money.' " 293 Kan. at 855. We disagreed, noting the absence of any evidence in the record indicating the jury's verdict was the product of the jury's concerns about wasting taxpayer money. 293 Kan. at 855.

Similarly, the record here lacks any evidence suggesting the financial implications of another trial troubled Gleason's jury. Instead, the record suggests Thompson's testimony primarily concerned the jury. Further, nothing in the record suggests the jury was deadlocked, near deadlock, or otherwise pressured to reach its verdicts. See *State v. Warrior*, 294 Kan. 484, 515, 277 P.3d 1111 (2012) (finding *Salts* error did not require reversal and noting absence of any indication in record that error affected jury deliberations).

In light of our review of the entire trial record, we are firmly convinced that the jury would not have reached different verdicts on any of the charges had the *Salts* error not occurred.

*The district court abused its discretion by allowing State witnesses to testify in prison clothing, but the error was harmless.*

Although not raised by Gleason, we can discern from the record that Thompson and Galindo, each of whom acted as Gleason's accomplices for one or more of the crimes charged, testified as

witnesses for the State while clothed in orange prison jumpsuits. In *State v. Ward*, 292 Kan. at 576, we held that

"a trial court almost always abuses its discretion . . . when it allows a defendant, witness, or nonwitness to be brought before a jury in jail clothing without an articulated justification explaining why it is necessary for the person to wear jail clothing and does not consider giving an admonition or instruction to the jury that it should not consider the clothing or the person's incarceration."

The record contains no articulation by the district court of a reason for either witness to appear in prison clothing. Nor does the record indicate that the trial court admonished the jury to disregard the witnesses' prison clothing. Admittedly, at the time of Gleason's trial, the district court lacked the benefit of *Ward*, but we nevertheless conclude, as we did in *Ward*, that the district court abused its discretion by allowing Thompson and Galindo to testify in prison clothing.

However, our independent review of the record also convinces us that this error was harmless. See 292 Kan. at 578 (stating harmless error standard). Significantly, *Ward* recognized that the primary potential impact or prejudice from witnesses associated with the defendant testifying in jail clothing arises from its impact on the credibility of those witnesses. 292 Kan. at 573. But under the facts of this case, it is equally likely that Gleason benefitted from having Thompson and Galindo testify, while clothed in orange prison jumpsuits, that they were serving time for the crimes they committed with Gleason. Notably, much of Gleason's defense strategy consisted of minimizing his own involvement in the crimes and suggesting his accomplices were more culpable, all the while challenging their credibility, particularly Thompson's. Consequently, we are satisfied beyond a reasonable doubt that there is no reasonable possibility this unassigned error contributed to the verdict obtained.

*The district court erred when it failed to respond to a jury question in open court and in Gleason's presence, but the error was harmless.*

Another error not raised by Gleason but apparent from the record relates to the district court's response to a jury question. After

beginning deliberations, the jury sent a written note to the court requesting a copy of Thompson's preliminary hearing testimony. In chambers, the court, the prosecutor, and defense counsel discussed the appropriate response. Defense counsel noted for the record that Gleason was not present at this discussion but that he had advised Gleason of the jury's question and the court's likely response. Ultimately, the prosecutor and defense counsel agreed to the following response: "[N]o, you can't have a copy but you can request a readback if you desire." The district court then provided this response to the jury in a written message rather than in open court.

The district court's procedure for responding to the jury question did not conform to K.S.A. 22-3420(3), which requires any question from the jury concerning the law or evidence pertaining to the case to be answered in open court in the defendant's presence unless the defendant is voluntarily absent. *State v. Bowen*, 299 Kan. 339, 323 P.3d 853, 864-65 (2014); *State v. King*, 297 Kan. 955, 967, 305 P.3d 641 (2013).

The court's failure to comply with the statutory procedure set out in K.S.A. 22-3420(3) constitutes both a violation of Gleason's statutory right to be present under K.S.A. 22-3405(1) and the constitutional right to be present under the Sixth Amendment to the United States Constitution. See *King*, 297 Kan. at 967-68 (citing *State v. Herbel*, 296 Kan. 1101, 1109, 299 P.3d 292 [2013]). Because this error implicates Gleason's constitutional rights, we must determine whether the error was harmless under the federal constitutional harmless error standard. *King*, 297 Kan. at 968-69. Under this standard, reversal is required unless we can say " 'beyond a reasonable doubt that the error . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, [that] there is no reasonable possibility the error contributed to the verdict.' " 297 Kan. at 968 (quoting *Ward*, 292 Kan. at 541, Syl. ¶ 6).

Four factors are relevant to this analysis:

"(1) the strength of the prosecution's case; (2) whether the defendant lodged an objection; (3) whether the communication concerned some critical aspect of the trial or was instead an innocuous and insignificant matter, as well as the manner

in which the communication was conveyed to the jury; and (4) the ability of a posttrial remedy to mitigate the constitutional error." *Bowen*, 299 Kan. at 357.

Here, only the third factor favors Gleason. Unquestionably, the jury's request for Thompson's preliminary hearing testimony concerned a critical aspect of the trial. Nevertheless, consideration of the first, second, and fourth factors lead us to characterize the error here as harmless. The prosecution's case against Gleason was strong, and physical evidence and testimony from other witnesses corroborated Thompson's testimony. Further, Gleason neither objected to the court's deficient procedure below nor raised this issue on appeal. Finally, Gleason and his defense counsel both were aware of the content of and procedure used to deliver the response and chose not to pursue any posttrial remedies for this constitutional error.

Under these circumstances and in light of the trial record as a whole, we have no hesitancy in finding no reasonable possibility this unassigned error affected the outcome of the trial.

*The cumulative effect of guilt-phase errors does not require reversal.*

Finally, Gleason contends that even if we find each asserted guilt-phase error to be individually harmless, the cumulative effect of those errors deprived him of a fair trial. Gleason specifically asserts "the instructional errors, the multitude of errors in the handling of Damien Thompson's refusal to testify, and the prosecutorial misconduct rendered the verdict[s] from this trial too infirm to be reliable."

" 'In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless. [Citation omitted.] In other words, was the defendant's right to a fair trial violated because the combined errors affected the outcome of the trial?' *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011)." *Warrior*, 294 Kan. at 517.

*Warrior* further explains that in assessing whether cumulative errors are harmless, we examine the record as a whole and consider "how the trial court dealt with the errors as they arose, including

the efficacy, or lack of efficacy, of any remedial efforts; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. [Citation omitted.]" *Warrior*, 294 Kan. at 517.

Here, we have found three errors, a nonreversible *Salts* error and two harmless errors based on issues raised *sua sponte* by this court under K.S.A. 2013 Supp. 21-6619(b) (authorizing court to notice unasserted errors apparent from record), namely, witnesses testifying in jail clothing and a jury question being answered in writing. Notably, the trial court had no opportunity to deal with any of these errors as they arose or to attempt remediation because Gleason did not raise the errors below. Further, these three procedural errors are unrelated, and the evidence against Gleason was strong. Consequently, we are convinced there is no reasonable possibility that these errors, even in the aggregate, affected the outcome of the trial, and reversal is not required.

## GUILT PHASE—CONCLUSION

Because we have found no guilt-phase errors requiring reversal, we affirm Gleason's convictions of capital murder, first-degree murder, aggravated kidnapping, aggravated robbery, and criminal possession of a firearm. However, because we are affirming all of Gleason's convictions, we must also address Gleason's claim that his first-degree murder conviction is multiplicitous with his capital murder conviction.

## MULTIPLICITY

The jury convicted Gleason of capital murder for killing Wornkey and Martinez and of first-degree murder for killing Wornkey. The State correctly concedes Gleason's first-degree murder conviction is multiplicitous with his capital conviction. See *Trotter v. State*, 288 Kan. 112, 123-24, 200 P.3d 1236 (2009) (citing *State v. Martis*, 277 Kan. 267, 83 P.3d 1216 [2004]) (first-degree premeditated murder is lesser included offense of capital murder as defined in K.S.A. 21-3439[a][6]); *State v. Scott*, 286 Kan. 54, 64-68, 183 P.3d 801 (2008) (when two convictions arise out of double homicide, one for capital murder as defined in K.S.A. 21-

3439[a][6], and one for first-degree, premeditated murder of one of the capital murder victims, convictions are multiplicitous).

Consequently, we reverse Gleason's first-degree murder conviction and vacate his corresponding hard 50 sentence, including the unauthorized period of postrelease supervision imposed as part of that sentence. See *State v. Summers*, 293 Kan. 819, 832, 272 P.3d 1 (2012) (noting that sentencing court has no authority to order any term of postrelease supervision when defendant receives off-grid indeterminate life sentence). The district court's error in imposing a period of lifetime postrelease supervision for the off-grid crime appears to have influenced its decision to impose the same unauthorized period of postrelease supervision for each on-grid crime. Accordingly, we also vacate the periods of lifetime postrelease supervision for each of Gleason's on-grid convictions and remand to the district court for resentencing consistent with the provisions of K.S.A. 22-3717.

### CHALLENGES TO IMPOSITION OF THE DEATH PENALTY

Next, we turn to Gleason's challenges to the penalty-phase portion of his bifurcated trial and the imposition of the death penalty. Gleason challenges the constitutionality of the death penalty under § 9 of the Kansas Constitution Bill of Rights, contends the aiding and abetting statute does not permit imposition of the death penalty, alleges several errors regarding the penalty-phase instructions and verdict forms, and claims some of the aggravating circumstances supporting his death sentence are legally invalid or not supported by sufficient evidence.

Because we conclude the district court failed to properly instruct the jury on its consideration of mitigating circumstances and this error requires us to vacate Gleason's death sentence and remand for resentencing, we address some but not all of Gleason's alleged penalty-phase errors and death penalty challenges.

### CHALLENGES TO THE VALIDITY AND SUFFICIENCY OF AGGRAVATING CIRCUMSTANCES

First, we briefly address Gleason's claims that the jury considered one or more invalid aggravating circumstances in determining

whether to impose his death sentence. In Kansas, the death penalty may be imposed only if the jury unanimously finds beyond a reasonable doubt that (1) the aggravating circumstances alleged by the State exist and (2) the existence of such aggravating circumstances is not outweighed by any mitigating circumstances found to exist. K.S.A. 21-4624(e).

Here, the State alleged the existence of four statutory aggravating circumstances, and the jury found all four: (1) Gleason was previously convicted of a felony in which he inflicted great bodily harm, disfigurement, or death on another, (2) Gleason knowingly or purposely killed or created a great risk of death to more than one person, (3) Gleason committed the crime in order to avoid or prevent his lawful arrest or prosecution, and (4) Martinez was killed because she was a prospective witness against Gleason. See K.S.A. 21-4625 (listing aggravating circumstances).

Gleason claims the latter three aggravating circumstances are invalid and argues the jury's consideration of these invalid aggravating circumstances infected the weighing process, requiring reversal of his death sentence. Because Gleason's arguments challenge the constitutional validity of these aggravating circumstances and may require statutory interpretation, our review is unlimited. See *State v. Sales*, 290 Kan. 130, 134, 224 P.3d 546 (2010).

*The risk of death aggravator is not unconstitutionally duplicative.*

Gleason argues the aggravating circumstance that he "knowingly or purposely killed or created a great risk of death to more than one person" (risk of death aggravator) is unconstitutionally duplicative because the State relied on the same evidence to support both an element of the capital murder charge and the aggravator. In support of his argument, Gleason cites *Lowenfield v. Phelps*, 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988), and *Stringer v. Black*, 503 U.S. 222, 112 S. Ct. 1130, 117 L. Ed. 2d 367 (1992). Gleason acknowledges that this court in *Scott*, 286 Kan. 54, resolved this issue adversely to his position, but he raises the issue to preserve it for federal review. Further, he urges us to reconsider *Scott*.

In *Scott*, this court reviewed *Lowenfield*, *Stringer*, and cases from other jurisdictions before concluding "the use of the same factor as both a narrowing qualification for the death penalty at the guilt phase and an aggravating factor at the penalty phase" is constitutionally permissible and conforms to legislative intent. *Scott*, 286 Kan. at 108-10. Gleason presents no arguments that persuade us to reconsider *Scott*, and we conclude the risk of death aggravator is not unconstitutionally duplicative.

*The avoid arrest and victim witness aggravators are not unconstitutionally duplicative.*

Gleason also argues two of the aggravating circumstances—(1) that he "committed the crime in order to avoid or prevent a lawful arrest or prosecution" (avoid arrest aggravator), and (2) that Martinez was killed because she was a prospective witness against Gleason (victim witness aggravator)—are unconstitutionally duplicative because "[i]f [Martinez] was killed because she was a prospective witness in a prosecution for the Elliott robbery, her killing was necessarily committed in order to avoid arrest or prosecution for that robbery." In support, Gleason primarily cites *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996), and *Cooks v. Ward*, 165 F.3d 1283 (10th Cir. 1998).

In *McCullah*, the United States Court of Appeals for the Tenth Circuit noted the "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." 76 F.3d at 1111. According to the *McCullah* panel, the double counting problem occurs when two aggravating circumstances substantially overlap each other. 76 F.3d at 1111. In *Cooks*, the Tenth Circuit clarified the applicable test and noted it is "not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance 'necessarily subsumes' the other." 165 F.3d at 1289.

The State suggests these Tenth Circuit cases are not persuasive in light of *Jones v. United States*, 527 U.S. 373, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999). In *Jones*, decided after both *McCullah* and *Cooks*, four members of the United States Supreme Court

questioned *McCullah*'s double counting theory and noted the Court had "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid." *Jones*, 527 U.S. at 398. Writing the opinion for a plurality of the Court on this particular issue, Justice Thomas noted:

"What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor. [Citation omitted.] Petitioner's argument (and the reasoning of the Fifth and Tenth Circuits) would have us reach a quite different proposition—that if two aggravating factors are 'duplicative,' then the weighing process necessarily is skewed, and the factors are therefore invalid." *Jones*, 527 U.S. at 398.

Ultimately, four members of the *Jones* Court concluded "[e]ven accepting, for the sake of argument, petitioner's 'double counting' theory," the aggravators at issue in that case which asked the jury to consider evidence relevant to the victim's personal characteristics, (1) from the perspective of how her death affected her family and (2) from the perspective of how those characteristics related to the victim's vulnerability, were not duplicative. *Jones*, 527 U.S. at 398-99. Rather, the court stated:

"[A]t best, certain evidence was relevant to two different aggravating factors. Moreover, any risk that the weighing process would be skewed was eliminated by the District Court's instruction that the jury 'should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater [but rather] should consider the weight and value of each factor.' " 527 U.S. at 399.

We conclude the avoid arrest and victim witness aggravators are not unconstitutionally duplicative because one factor does not necessarily subsume the other. To establish the avoid arrest aggravator, "the State must show that a motive—not the dominant or only motive—for the murder was to avoid prosecution." *State v. Kleypas*, 272 Kan. 894, 1022, 40 P.3d 139 (2001) (citing *State v. Spain*, 263 Kan. 708, 719, 953 P.2d 1004 [1998]). Similarly, we conclude that to establish the victim witness aggravator the State must show the victim's status as a current or prospective witness in a criminal proceeding was a motive—not the dominant or only motive—for the murder.

Here, as in *Jones*, certain evidence was relevant to two different aggravators but because one aggravator does not necessarily subsume the other, the aggravators were not unconstitutionally duplicative. Further, any risk of a skewed weighing process was eliminated because Gleason's jury, like the jury in *Jones*, was instructed that "[i]n making the determination whether aggravating circumstances exist that are not outweighed by any mitigating circumstances found to exist, you should keep in mind that your decision should not be determined by the number of aggravating or mitigating circumstances that are shown to exist." See *Jones*, 527 U.S. at 399-400. Consequently, we reject Gleason's challenge to the validity of these aggravators.

*Sufficient evidence supports the aggravating factors found by the jury.*

Gleason also challenges the sufficiency of the evidence to support three of the four aggravating circumstances found by the jury. And, in reviewing a death sentence we have an independent duty to consider the sufficiency of the evidence to support the jury's findings on aggravating circumstances. See K.S.A. 2013 Supp. 21-6619(c)(2) (providing this court "shall determine . . . whether the evidence supports the findings that an aggravating circumstance or circumstances existed").

"In a capital case, the standard of review on appeal as to the sufficiency of the evidence regarding an aggravating circumstance is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Kleypas*, 272 Kan. 894, Syl. ¶ 50.

Viewing the evidence in the light most favorable to the State, we conclude sufficient evidence supports all four aggravating circumstances found by the jury.

Regarding the avoid arrest and victim witness aggravators, the evidence established that Gleason, Thompson, Galindo, Fulton, and Martinez robbed Elliott on February 12, 2004. After the robbery, Gleason and Thompson, collectively and individually, threatened their accomplices to discourage them from talking to the po-

lice about the robbery. Later, Gleason and Thompson learned that Martinez and Fulton had talked to the police and, 9 days after the robbery, Gleason and Thompson killed Martinez and Wornkey. We are convinced that a rational factfinder could have found beyond a reasonable doubt both that Gleason killed Martinez to avoid arrest or prosecution for the Elliott robbery and that Martinez was killed because she was a prospective witness against Gleason regarding the Elliott robbery. Further, we note that because Martinez witnessed Wornkey's murder, it also would have been reasonable for the jury to conclude that Gleason killed Martinez to avoid arrest or prosecution for killing Wornkey and that Martinez was killed because she was a prospective witness against Gleason regarding Wornkey's murder.

Gleason challenges the sufficiency of the evidence to support the risk of death aggravator by incorporating his previous argument regarding the State's alleged failure to prove the murders of Wornkey and Martinez were committed as "part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." We rejected that argument in the guilt phase portion of this opinion because the State's evidence clearly established the requisite connection between the two murders. This same evidence supports the jury's finding that Gleason "knowingly or purposely killed . . . more than one person." See K.S.A. 21-4625(2).

Finally, the evidence clearly supports that Gleason previously had been convicted of a felony in which he inflicted great bodily harm, disfigurement, dismemberment, or death on another. See K.S.A. 21-4625(1). Agent Latham testified Gleason was convicted of attempted voluntary manslaughter in 2001 and that at the time of Gleason's trial in this case, the victim of that crime still had a bullet lodged in his chest, had significant scars from three gunshot wounds, and had a surgical scar from the removal of a bullet from his hip.

*Conclusion*

We conclude the jury considered only valid aggravating circumstances in determining whether to impose Gleason's death sen-

tence and sufficient evidence supports the jury's findings as to all four aggravating circumstances. Thus, Gleason is not entitled to reversal of his death sentence based on his challenges to the validity or sufficiency of the aggravating circumstances.

### CHALLENGES TO PENALTY-PHASE INSTRUCTIONS

Next, we address only one of Gleason several challenges to penalty-phase instructions because we conclude that one alleged instruction error—the district court's failure to properly instruct the jury regarding its consideration of mitigating circumstances—requires that we vacate Gleason's death sentence and remand for resentencing.

*The district court committed reversible error when it failed to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt.*

Gleason claims the district court erred in failing to instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt. Further, he argues this error requires reversal because the instructions as a whole exacerbated the error and there is a reasonable likelihood the jurors were precluded from considering relevant mitigating evidence in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

### Standard of Review

"In considering a claim that a jury instruction in the penalty phase of a capital trial prevented the jury from giving proper consideration to mitigating evidence, our standard of review is 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' *Boyde v. California*, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990)." *Scott*, 286 Kan. at 104-05.

### Analysis

Under the Eighth Amendment, "a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-74, 126 S. Ct. 2516,

165 L. Ed. 2d 429 (2006). "The use of mitigation evidence is a product of the requirement of individualized sentencing," and to satisfy that requirement the sentencing judge or jury in a capital case must be allowed to consider all relevant mitigating evidence. 548 U.S. at 174-75 (citing *Graham v. Collins*, 506 U.S. 461, 484-90, 113 S. Ct. 892, 122 L. Ed. 2d 260 [1993] [Thomas, J., concurring]); see also *Smith v. Spisak*, 558 U.S. 139, 130 S. Ct. 676, 681-82, 175 L. Ed. 2d 595 (2010) (sentencing judge or jury may not refuse to consider *or be precluded from considering* any relevant mitigating evidence).

Barriers to a capital sentencer's consideration of relevant mitigating evidence are impermissible regardless of whether the barriers are imposed by statute, judicial interpretation of a statute, jury instructions and verdict forms, or prosecutorial argument. See, *e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 264, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007) ("Our cases following *Lockett* [*v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978),] have made clear that when the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed."); *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860, 100 L. Ed. 2d 384 (1988) ("Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, . . . by the sentencing court, . . . or by an evidentiary ruling . . . .").

This court previously has considered claims that penalty-phase jury instructions impermissibly precluded consideration of relevant mitigating evidence. In *Kleypas*, the defendant argued that a penalty-phase instruction prevented jurors from considering any mitigating circumstances not unanimously found to exist by the jury, in violation of *Mills*. *Kleypas*, 272 Kan. at 1075-76; see *McKoy v. North Carolina*, 494 U.S. 433, 435, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) (invalidating North Carolina statute that required jury unanimity as to existence of mitigating circumstances); *Mills*, 486 U.S. at 369-84 (concluding jury instructions and verdict forms violated Eighth Amendment because jurors "may have thought they

were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance").

The instruction at issue in *Kleypas* stated, in part: " 'It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment.' " 272 Kan. at 1077. The court concluded this instruction correctly stated the law and satisfied *Mills* and *McKoy* because it informed jurors they need not be unanimous as to the existence of mitigating circumstances. *Kleypas*, 272 Kan. at 1078-79. But the *Kleypas* court further stated:

"Whether this sentence goes far enough by itself can only be determined by examining the other instructions relating to consideration by the jury of the aggravating and mitigating facts and circumstances. But, any instruction dealing with the consideration of mitigating circumstances should state (1) they need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision." 272 Kan. at 1078.

Following this court's ruling in *Kleypas*, the PIK committee amended the PIK instruction on mitigating circumstances to reflect *Kleypas'* second statement regarding jury unanimity. But inexplicably, the committee did not amend the instruction to include the first statement—that mitigating circumstances need only be proven to the satisfaction of the individual juror and not beyond a reasonable doubt. See PIK Crim. 3d 56.00-D (2001 Supp.).

Several years later in *Scott*, this court again considered whether capital penalty-phase jury instructions impermissibly precluded the jury from considering mitigating circumstances not unanimously agreed upon by the jury. The court reiterated that *Kleypas'* two statements should be included in any mitigating circumstance instruction and then found reversible error because the trial court failed to include the second statement relating to jury unanimity. *Scott*, 286 Kan. at 104-07.

In finding reversible error in the court's failure to affirmatively inform jurors they need not unanimously agree on mitigating circumstances, the *Scott* court considered the instructions as a whole, noting:

"[T]he instructions repeatedly emphasize the need for unanimity as to any aggravating circumstance found to exist. Conversely, the trial court's instructions do not inform the jury as to a contrary standard for determining mitigating circumstances. The jury is left to speculate as to the correct standard. Under these circumstances, we conclude there is a substantial probability reasonable jurors could have believed unanimity was required to find mitigating circumstances. We hold failure of the trial court to provide the jury with a proper standard for determining mitigating circumstances constitutes reversible error. See *Mills v. Maryland*, 486 U.S. 367, 100 L. Ed. 2d 384, 108 S. Ct. 1860 (1988) (holding a death sentence should be vacated where there was a substantial probability reasonable jurors may have thought they could only consider those mitigating circumstances unanimously found to exist)." *State v. Scott*, 286 Kan. 54, 107, 183 P.3d 801 (2008).

Notably, the current PIK instruction on mitigating circumstances, PIK Crim. 4th 54.050, incorporates both of *Kleypas'* recommended statements and correctly instructs the jury that "[m]itigating circumstances need not be proved beyond a reasonable doubt." But here, the trial court instructed the jury regarding mitigating circumstances consistently with the PIK instruction in effect at the time of Gleason's trial, PIK Crim. 3d 56.00-D (2001 Supp.), as follows:

"Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense.

"The appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed.

"The determination of what are mitigating circumstances is for you as jurors to decide under the facts and circumstances of this case. Mitigating circumstances are to be determined by each individual juror when deciding whether the State has proved beyond a reasonable doubt that the death penalty should be imposed. The same mitigating circumstances do not need to be found by all members of the jury in order to be considered by an individual juror in arriving at his or her sentencing decision.

"[This part of the instruction listed the nine mitigating circumstances asserted by Gleason.]

"You may further consider as a mitigating circumstance any other aspect of the defendant's character, background or record, and any other aspect of the offense which was presented in either the guilt or penalty phase which you find may serve as a basis for imposing a sentence less than death. Each of you must consider every mitigating circumstance found to exist."

As Gleason points out, despite this court's repeated recognition of the required content of penalty-phase mitigating circumstances instructions, this instruction erroneously failed to inform the jury that mitigating circumstances "need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt." See *Scott*, 286 Kan. at 106-07; *Kleypas*, 272 Kan. at 1078.

Notably, Gleason's argument rests on *Kleypas'* first statement regarding the required content of mitigating instructions, while only the second *Kleypas* statement implicates the *Mills/McKoy* prohibition against a jury unanimity requirement as discussed in *Kleypas* and *Scott*. But we find this to be a distinction without a difference because both recommended statements from *Kleypas* implicate the broader Eighth Amendment principle prohibiting barriers that preclude a sentencer's consideration of all relevant mitigating evidence. See, *e.g.*, *Smith v. Spisak*, 558 U.S. at 144 (sentencing judge or jury may not refuse to consider *or be precluded from considering* any relevant mitigating evidence).

We recognize that the United States Supreme Court has explained that its Eighth Amendment jurisprudence on capital sentencing should not be interpreted as creating any constitutional requirements as to how or whether a capital jury should be instructed on the burden of proof for mitigating circumstances. See *Walton v. Arizona*, 497 U.S. 639, 649-51, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (explaining that Court's death penalty decisions should not be interpreted to create any constitutional requirements as to how or whether capital jury should be instructed on burden of proof for mitigating circumstances), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). The *Walton* Court held: "So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove . . . aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." 497 U.S. at 650.

But the capital sentencing statute at issue in *Walton* explicitly required defendants to prove mitigating circumstances by a "pre-

ponderance of the evidence" standard. 497 U.S. at 651. Kansas' capital sentencing statute differs distinctly from the statute at issue in *Walton*, and that distinction is critical to our analysis here. Namely, while K.S.A. 21-4624 requires the State to prove aggravating circumstances beyond a reasonable doubt, the statute is silent as to any burden of proof for mitigating circumstances. K.S.A. 21-4624(e); see also *Marsh*, 548 U.S. at 173 (contrasting Kansas' statute, which places no evidentiary burden on capital defendants, with Arizona's statute, which requires capital defendants to prove mitigating circumstances by a preponderance of the evidence).

As the United States Supreme Court recognized, "[t]his distinction operates in favor of Kansas capital defendants." 548 U.S. at 173. Notably, *Kleypas'* first statement—that any mitigating circumstance instruction must inform the jury that mitigating instructions "need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt," both preserves the statute's favorable distinction and protects a capital defendant's Eighth Amendment right to individualized sentencing by ensuring jurors are not precluded from considering all relevant mitigating evidence. *Kleypas*, 272 Kan. at 1078.

In conclusion, both *Kleypas* and *Scott* support Gleason's claim that the trial court here erroneously instructed the jury regarding mitigating circumstances. Here, the instruction failed to affirmatively inform the jury that mitigating circumstances need only be proved to the satisfaction of the individual juror in that juror's sentencing decision and not beyond a reasonable doubt. See *Kleypas*, 272 Kan. 1078. Instead, the instruction informed the jury: "The determination of what are mitigating circumstances is for you as jurors to decide under the facts and circumstances of the case. Mitigating circumstances are to be determined by each individual juror when deciding whether the State has proved beyond a reasonable doubt that the death penalty should be imposed."

Because K.S.A. 21-4624 expressly burdens the State with proving the existence of aggravating circumstances beyond a reasonable doubt but places no evidentiary burden regarding the existence of mitigating circumstances on the defendant beyond the burden of production, we reiterate our holding in *Kleypas* and *Scott* that cap-

ital juries in Kansas must be informed that mitigating circumstances need not be proven beyond a reasonable doubt. Because the instruction given in this case failed to do so, it was erroneous.

Further, we agree with Gleason that, as in *Scott*, the instructions as a whole in this case exacerbated rather than cured the instructional error. Namely, the instructions repeatedly emphasized the State's burden to prove the existence of aggravating circumstances beyond a reasonable doubt and to prove beyond a reasonable doubt that the death penalty should be imposed. Conversely, the instructions never informed or explained to the jury that no particular burden of proof applied to mitigating circumstances.

Thus, as in *Scott*, Gleason's jury was left to speculate as to the correct burden of proof for mitigating circumstances, and reasonable jurors might have believed they could not consider mitigating circumstances not proven beyond a reasonable doubt. Thus, jurors may have been prevented from giving meaningful effect or a reasoned moral response to Gleason's mitigating evidence, implicating Gleason's right to individualized sentencing under the Eighth Amendment. See *Scott*, 286 Kan. at 107 (relying on *Mills* to reason that failure to instruct jurors that they need not be unanimous as to existence of mitigating circumstances left jury to speculate as to appropriate standard and likely caused jurors to believe they could only consider those mitigating circumstances unanimously found to exist).

### Conclusion

The district court's instruction on mitigating circumstances failed to affirmatively inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt. And the penalty-phase instructions as a whole exacerbated the error because they referred only to the beyond-a-reasonable-doubt burden of proof. Under these circumstances, we conclude a reasonable likelihood exists that the jury applied the mitigating circumstances instruction in a manner precluding individual jurors from properly considering relevant mitigating evidence as required by the Eighth Amendment. Consequently, we vacate Gleason's death sentence and remand for resentencing.

CONSTITUTIONAL AND STATUTORY CHALLENGES TO THE DEATH
PENALTY

Gleason contends the death penalty is an unconstitutionally disproportionate punishment under § 9 of the Kansas Constitution Bill of Rights as applied to an entire category of offenders to which he claims to belong, namely "non-triggerman accomplice[s] who ha[ve] been found guilty of capital murder based on aiding and abetting." Alternatively, Gleason argues the death penalty is an unconstitutionally disproportionate punishment as applied to him in comparison to the sentence imposed against his accomplice. Additionally, Gleason contends the aiding and abetting statute does not permit imposition of the death penalty when a capital murder conviction is based on aiding and abetting liability.

Because we are vacating Gleason's death sentence, we decline to consider his constitutional and statutory challenges to the death penalty. See *State v. Soto*, 299 Kan. 102, 130, 322 P.3d 334 (2014) (declining to consider Eighth Amendment challenges to hard 50 sentence when sentence vacated on other grounds); *State v. Jones*, 293 Kan. 757, 762, 268 P.3d 491 (2012) (declining to reach Eighth Amendment challenge to lifetime postrelease supervision when defendant's sentence vacated on other grounds). We note that Gleason is free to raise these issues below if the State seeks imposition of the death penalty on remand.

Finally, we decline to address Gleason's argument that the penalty-phase verdict forms did not adequately protect his right to be free from double jeopardy as guaranteed by the Fifth Amendment to the United States Constitution and interpreted by *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003). While we vacate Gleason's sentence today, this issue will be ripe only if the State seeks imposition of the death penalty on remand. See *State v. Burnett*, 293 Kan. 840, 847-50, 270 P.3d 1115 (2012).

PENALTY PHASE—CONCLUSION

We reject Gleason's challenges to the legal validity and evidentiary sufficiency of the aggravating circumstances supporting his death sentence. But we conclude the district court failed to prop-

erly instruct the jury on its duty to consider mitigating circumstances and hold a reasonable likelihood exists that this erroneous instruction precluded the jury from considering relevant mitigating evidence. Accordingly, we vacate Gleason's death sentence and remand for further proceedings consistent with this opinion. Because we vacate Gleason's death sentence, we decline to consider Gleason's constitutional and statutory challenges to his death sentence.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

* * *

LUCKERT, J., concurring in part and dissenting in part: I respectfully dissent from the majority opinion on two issues. Specifically, I would hold: (1) The district court's admission of Damien Thompson's preliminary hearing testimony violated Sidney Gleason's constitutional right to confront witnesses, and (2) the district court abused its discretion when it denied Gleason's motion for a mistrial. These errors require reversal of Gleason's convictions for capital murder, aggravated kidnapping, and criminal possession of a firearm, but not Gleason's conviction for aggravated robbery.

## CONFRONTATION CLAUSE VIOLATION

The United States Supreme Court has repeatedly emphasized that "[t]here are few subjects, perhaps, upon which [the United States Supreme] Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). The right encompasses not only "testing the recollection and sifting the conscience of the witness" through cross-examination, but also compelling the witness "to stand face to face with the jury in order that they may look at [the witness], and judge by [the witness'] demeanor upon the stand and the manner in which [the witness] gives his testimony whether [the witness] is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242-43, 15 S. Ct. 337, 39 L. Ed. 409 (1895); see *Barber v. Page*, 390 U.S.

719, 725, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968) ("The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness.").

To fulfill these objectives and uphold the Constitution, the State must make a good-faith effort and exercise reasonable diligence to obtain in-person trial testimony of all its witnesses. If a witness is unavailable—either because he or she is physically absent, asserts a privilege, is disqualified as a witness, or refuses to testify—and the State wants a jury to hear the preliminary hearing testimony of the witness, the State must establish that in-person testimony cannot be obtained despite the State's good-faith effort and reasonable diligence. See *Hardy v. Cross*, 565 U.S. ___, 132 S. Ct. 490, 494, 181 L. Ed. 2d 468 (2011) (citing *California v. Green*, 399 U.S. 149, 189, n.22, 90 S. Ct. 1930, 26 L. Ed. 2d 489 [1970] [Harlan, J., concurring]); *State v. Flournoy*, 272 Kan. 784, 799-802, 36 P.3d 273 (2001); *State v. Washington*, 206 Kan. 336, 338, 479 P.2d 833 (1971); see also K.S.A. 60-459(g) (defining " '[u]navailable as a witness' ").

In this case, the district court was not asked to and did not determine whether the State met this burden. Although the majority does not discuss the standard of review, a failure to apply the correct legal standard is error, even under the most deferential of standards. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Further, the failure resulted in reversible error because the State failed to meet its burden and the error affected the jury verdict.

Early in the proceedings, the State gave away the most effective tool it had to enforce Thompson's agreement to testify at all proceedings against Gleason when the prosecutor asked the district court to sentence Thompson immediately after Gleason's preliminary hearing rather than asking that sentencing be delayed until Thompson fulfilled the plea agreement by testifying at Gleason's trial. At the sentencing hearing, the State met its final obligation under the plea agreement by not asking the court to impose a hard 50 life sentence for the premeditated first-degree murder of Mik-

iala Martinez, the only charge against Thompson that remained after the State dismissed all other counts as agreed.

The State's voluntary rush to fulfill its obligations before it was known whether Thompson would fully perform his part of the plea agreement is analogous to consummating the sale of a car by handing the purchaser the car keys, telling him to enjoy the car, and asking him to come back in a couple of years with enough cash to pay for the car. A seller who wanted to ensure payment would hold onto the car keys until the cash was in hand. Here, the State handed Thompson the keys without full payment.

Thompson, therefore, likely believed he had nothing to lose when he walked into the courtroom for Gleason's trial approximately 2½ years later and refused to testify to anything of substance. His refusal was predictable, and when the predictable outcome became reality, the prosecutor had few tools remaining. One available tool was to have Thompson's attorney warn Thompson of the consequences of violating the plea agreement. But the prosecutor did not attempt to use this tool. Instead, Gleason's counsel was the one who suggested Thompson's attorney needed to be present, and the district court agreed. Even then, the prosecutor indicated there was no need for this, stating he had talked to Thompson's attorney the night before and Thompson's attorney had said that his client did not want him there. Nevertheless, Thompson's counsel was called; he travelled from Wichita to Great Bend and spoke to Thompson, warning him the State might seek to revoke the plea agreement and seek the death penalty. When Thompson still refused to testify, the State asked the judge to order Thompson to testify and to hold him in contempt if he refused.

At that point, Gleason's defense counsel urged the court to give Thompson the opportunity to ponder his attorney's recent warning about the potential reinstatement of the death penalty and to bring Thompson back to court the next day to allow him to purge his contempt. With the renewed possibility of a death sentence, there was a huge incentive for Thompson to change his mind and a reasonable chance he would do so. After all, according to the prosecutor, Thompson had been willing to testify the night before when his attorney had talked to him. This means that Thompson either

misled his attorney or changed his mind overnight. If he had changed his mind, it seems possible—even probable—he could change his mind again.

Delaying the ruling on whether Thompson was an unavailable witness until the next morning would have been a minimal burden on the State, the court, and the jury. When Gleason's counsel asked for the delay, he pointed out that it was 3 p.m. and court would "be recessing in a couple [of] hours."

Instead of agreeing to bring Thompson back the next morning, which might have resulted in Thompson's in-person testimony, the prosecutor insisted the trial continue without delay because the parties were "in the middle of a trial." The prosecutor asserted, "[W]e have got to go on and we've got to continue with the rest of the witnesses. We can't just wait in the wings, and that's essentially what [defense counsel] is wanting you to do, and that's just not necessary here. It's sufficient for the record that we have established."

This position minimized the importance of the constitutional right of confrontation and evidenced the State's complacent, rather than diligent, approach to ensuring Thompson's in-person testimony. Given these circumstances, I would not accept, as does the majority, that the prosecutor was reasonably diligent when he merely asked the district court to order Thompson to answer questions and to hold him in contempt if he refused.

The majority reasons that the prosecutor had done as much or more to obtain Thompson's testimony as had been done in other cases, and the district court had taken the additional step of arranging for Thompson to speak to his attorney. In light of the constitutional right at stake and the penalty that Gleason faced, failing to utilize such a simple, straightforward, and low-burden step toward a fair trial is troubling. Even more troubling is the position of the State as expressed in its brief before this court in which it argued: "The situation facing the district court was no different" than that in *State v. Jefferson*, 287 Kan. 28, 194 P.3d 557 (2008), and *State v. Terry*, 202 Kan. 599, 451 P.2d 211 (1969), because "Thompson plainly and unequivocally refused to testify, even after consulting with counsel and considering the potential ramifica-

tions." Like the prosecutor at trial, the State appears to perceive it has only a minimal burden and need only make a record that the witness has refused to answer questions after being held in contempt, even if no opportunity has been given to purge that contempt.

The majority's holdings and the State's arguments imply there is a checklist of actions that equate to reasonable diligence. This position is contrary to the decisions of federal courts and other state courts when applying the Confrontation Clause of the Sixth Amendment to the United States Constitution. Significantly, the Tenth Circuit Court of Appeals, in reversing this court's holding that a physically absent witness was unavailable for Confrontation Clause purposes, held the "evaluation of reasonableness or good-faith effort 'requires us to consider all the circumstances rather than to apply a per se rule.' " *Cook v. McKune*, 323 F.3d 825, 835 (10th Cir. 2003) (quoting *Martinez v. Sullivan*, 881 F.2d 921, 924 [10th Cir. 1989]). As a result, a court errs if it declares a witness unavailable simply because the State did as much or more as had been done in another situation. Rather, a court determining whether the prosecution has made a reasonable, good-faith effort to secure a witness' testimony at trial must conduct a context- and fact-specific analysis. *Brooks v. United States*, 39 A.3d 873, 883 (D.C. 2012); see *Cook*, 323 F.3d at 835-40.

To assist in evaluating whether the State has acted with reasonable diligence and made a good-faith effort to obtain a witness' in-person trial testimony, courts have identified four factors: (1) whether the testimony is crucial to the State's case or goes to minor, collateral, or uncontested matters; (2) the severity of the crime for which the defendant is on trial; (3) whether the witness has a special reason to favor the prosecutor, such as an immunity agreement for cooperation; and (4) whether the State made the same effort to secure the witness' testimony as it would have made if the State did not have prior testimony of that witness available to present at trial. *E.g.*, 323 F.3d at 835-36. An application of these factors in this case reveals the State did not make a good-faith effort or exercise reasonable diligence.

As to the first factor, the Tenth Circuit indicated "the more crucial the witness, the greater the effort required to secure his attendance." 323 F.3d at 835. Other courts have also emphasized the importance of allowing the jury to assess the credibility of a witness increases if the witness' testimony is critical to the case, and "[i]t is axiomatic that '[d]emeanor is of the utmost importance in the determination of credibility of a witness.' *Gov't of the Virgin Is. v. Aquino*, 378 F.2d 540, 548 (3d Cir. 1967)." *Brooks*, 39 A.3d at 884. In-person testimony is the most effective means for a jury to assess a witness' demeanor, offering the opportunity to observe " 'the quality, age, education, understanding, behavior, and inclinations of the witness.' " *United States v. Yida*, 498 F.3d 945, 950 (9th Cir. 2007) (quoting 3 William Blackstone, Commentaries 373-74 [1768]). In contrast, "[t]ranscripts of a witness's prior testimony, even when subject to prior cross-examination, do not offer any such advantage, because 'all persons must appear alike, when their [testimony] is reduced to writing.' " 498 F.3d at 950 (quoting 3 Blackstone, Commentaries 374).

In this case, this first factor weighs strongly in favor of a determination that the State needed to make a significant effort because Thompson's testimony was crucial to the State's case. Scant other evidence implicated Gleason in the crimes related to the double homicide and kidnapping, and no other evidence established that he possessed a gun. The other evidence linking Gleason to the double homicide and kidnapping provided no details relating to the elements of the crimes. Brittany Fulton testified Gleason had threatened that "if somebody tells the cops something, people are going to disappear." Additionally, Great Bend Police Officer Heather Smith saw Thompson's car near Martinez' home just before the shooting, a neighbor saw two men shove Martinez into the car, and Thompson's ex-girlfriend testified Thompson and Gleason left and returned home together the night Martinez disappeared. Further, the State linked Gleason to shoes stained with Martinez' blood.

Nevertheless, only Thompson identified the shoes as Gleason's, and his testimony (1) established Gleason's actual participation in the double homicide and aggravated kidnapping, (2) identified

Gleason as the one who shot Darren Wornkey, (3) placed the .22 caliber revolver in Gleason's hands, and (4) provided evidence of Gleason's intent to kill Martinez by testifying Gleason walked toward Martinez with his gun pointed at her as if he was going to shoot her. If Thompson's testimony regarding these details had not been admitted during Gleason's trial, a jury could have determined the State had failed to meet its beyond-a-reasonable-doubt burden of proof. Consequently, the State needed to make a significant effort to obtain Thompson's in-person testimony, and it did not.

The second factor relates to the severity of the crime. Gleason was charged with the most serious crime that exists in this state, capital murder. In *Cook*, the Tenth Circuit Court of Appeals emphasized that "because there is a real cost to the defendant in foregoing true confrontation, the unavailability requirement must be more than a formality." 323 F.3d at 832. Later in the opinion, the Tenth Circuit quoted *McCandless v. Vaughn*, 172 F.3d 255, 266 (3d Cir. 1999), to make a point that is critical to the analysis in this case: " 'In a capital case, for example, it is fair to ask more of the prosecution than in a situation involving significantly less serious consequences.' " *Cook*, 323 F.3d at 836.

Yet, the State asks us to be satisfied with what had been done in *Jefferson*, 287 Kan. 28, an aggravated battery case, and *Terry*, 202 Kan. 599, a noncapital premeditated murder case. Neither case exposed the defendant to the severe consequences of punishment by death.

Likewise the third factor—whether the witness has a special reason to favor the prosecutor, such as an immunity agreement for cooperation—weighs heavily against the majority's conclusion that the State's efforts were reasonable. In exchange for Thompson's testimony, the State agreed to dismiss very serious charges against Thompson, including one count of capital murder. In light of this favorable plea agreement, Gleason had a strong interest in confronting Thompson before the ultimate factfinders—the jurors. See *Cook*, 323 F.3d at 836 (stating that defendants have a stronger interest in confronting witnesses who are granted immunity by the State).

Finally, courts should evaluate whether the State made the same effort to secure the witness' testimony as it would have made if the State did not have the witness' preliminary hearing testimony available to present at trial. 323 F.3d at 836. In this case, the answer to this factor is clear: The prosecutor would not have been willing to give up so easily and would have been begging the district court to bring Thompson back to court the next day to see if he had changed his mind. This point distinguishes the only capital murder case relied on by the majority, *Lowery v. Anderson*, 225 F.3d 833, 839-40 (7th Cir. 2000), *superseded by statute on other grounds Corcoran v. Buss*, 551 F.3d 703 (7th Cir. 2008), *cert. granted, judgment vacated, and remanded by Corcoran v. Levenhagen*, 558 U.S. 1, 130 S. Ct. 8, 175 L. Ed. 2d 1 (2009).

In *Lowery*, both the prosecutor and trial judge offered the witness numerous opportunities to purge his contempt. The appellate court cited these efforts several times in its analysis, suggesting the significance of the repeated opportunities. At one point in the opinion, the court explained that the witness had been held in contempt and then, "[*t*]*he next day*, this procedure was repeated and the same result obtained." (Emphasis added.) *Lowery*, 225 F.3d at 838. Later in the opinion, after noting that the trial judge had held the witness in contempt, the *Lowery* court emphasized that "this procedure was repeated several times, outside the jury's presence." 225 F.3d at 839. Then, in the jury's presence, "[h]e refused again to testify and was again held in contempt." 225 F.3d at 839.

In this case, despite the majority's heavy reliance on *Lowery*, the majority does not explain why it was reasonable to deny Thompson the same opportunities as had been given the *Lowery* witness. And neither the State nor the majority attempts to explain why it was reasonable for the prosecutor to object to giving the witness an opportunity to contemplate the consequences of his refusal to testify after those consequences had just been explained to him by his attorney. The prosecutor's only justification at trial was that they should not be left to "wait in the wings." This superficial excuse becomes even weaker when viewed in light of what transpired.

Just minutes later, it became obvious the jury proceedings would be delayed because Gleason orally moved for a mistrial and lengthy

arguments ensued. The jury was dismissed for the rest of that afternoon, which was a Thursday, and all of the next day while the parties presented oral arguments and defense counsel prepared written arguments for the court's consideration. On Monday morning, the court and counsel resumed the legal arguments based on the written materials the court received over the weekend. Approximately 3½ days after Thompson had received the advice of his attorney and had been held in contempt, the jury proceedings resumed. Thompson's preliminary hearing testimony was read into the record, and the State rested without "continu[ing] with the rest of the witnesses" that the State had argued could not be left waiting in the wings.

Thus, by late Thursday afternoon the justification for the State's excuse—*i.e.*, that the jury proceedings should not be delayed—had evaporated, if it ever existed. The jury proceedings had been delayed anyway, and questioning Thompson on Friday morning would have, at most, added a few minutes to the delay. At best, giving Thompson the opportunity to purge his contempt might have ended the delay if he had changed his mind and testified. By Friday and certainly by Monday morning, if not before, the requirement of a good-faith effort and reasonable diligence dictated that the State take steps to bring Thompson back to court so he could be given another opportunity to purge his contempt. The record discloses that Thompson was housed in a prison located sufficiently close that he was transported to the trial the morning he was to testify, and he could and should have been returned to court.

While neither *Jefferson* nor *Terry* required more than one opportunity for a witness to change his or her mind about refusing to testify, there is no indication either defendant had requested such an opportunity be offered. But such a request was made in this case, and the prosecutor's opposition to such a simple effort to obtain Thompson's in-person testimony reflected a lack of good faith and reduced Gleason's confrontation right to a mere formality.

Moreover, the focus should not be solely on what happened after Thompson refused to testify. As previously noted, the State's ef-

forts to diligently obtain Thompson's trial testimony derailed before the trial even began because of the way in which the State handled its part of the plea agreement. I would not go so far as to say that the State had to delay sentencing until after Thompson had testified at Gleason's trial in order for Thompson to be declared unavailable. To lay down such a rule would be contrary to the caselaw that suggests there should be no bright-line rule enunciating steps the State must take to obtain a witness' trial testimony before a witness can be declared unavailable. Yet, delaying sentencing of a witness who has agreed to testify at another's trial as part of a plea agreement until after the witness testifies at trial would be a better practice, especially in a case where the other unavailability factors weigh so heavily against the State. Certainly doing so would have weighed in the State's favor on this final factor and, conversely, the failure to do so suggests a lack of good faith in obtaining Thompson's in-person trial testimony and a willingness to proceed by reading from the cold preliminary hearing transcript.

In summary, handing the keys to Thompson, especially when combined with the prosecutor's attempts to rush Thompson out of the courtroom and away from any opportunity to change his mind, signals that the State approached Gleason's constitutional right to confrontation as a mere formality. The State certainly did not make as much effort to ensure the jury heard Thompson's in-person trial testimony as it took to ensure it had a preliminary hearing transcript that could later be used as a substitute for Thompson's in-person trial testimony.

Consequently, I would hold that the State did not make a good-faith effort or act with reasonable diligence to obtain Thompson's in-person testimony before the jury. As a result, the district court erred in ruling that Thompson was unavailable and in admitting his preliminary hearing testimony, and these errors violated Gleason's right of confrontation under the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. See *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *Jefferson*, 287 Kan. at 39.

## MOTION FOR MISTRIAL

The district court also erred in denying Gleason's motion for mistrial. Gleason argued witnesses had testified to hearsay statements made by Thompson regarding the double homicide, the court had admitted the statements under K.S.A. 60-460(a) based on the assumption that Thompson would testify at trial and be available for cross-examination, and Thompson's refusal to testify undermined the necessary foundation for applying K.S.A. 60-460(a). See K.S.A. 60-460(a) (allowing admission of hearsay statement "previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness").

The district court denied the motion, concluding Gleason had cross-examined Thompson at the preliminary hearing about the underlying facts of the homicides and, thus, about the subject matter of the hearsay statements. Obviously, this ruling depended on the appropriateness of admitting Thompson's preliminary hearing testimony. Because the district court erred in admitting the preliminary hearing testimony, it also erred in admitting Thompson's hearsay statements.

## REVERSIBLE ERROR

These errors violated Gleason's constitutional right of confrontation. In light of the constitutional error, the State has the burden of satisfying the harmless error standard recognized in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under *Chapman*, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. The issue is not whether the jury would have reached a different verdict but rather whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24.

As previously noted, Thompson's preliminary hearing testimony and hearsay statements were the only direct evidence of Gleason's involvement in the double homicide. Even the physical evidence

of blood on the shoes depends on Thompson's statements identifying the shoes as Gleason's. Without Thompson's testimony and hearsay statements, the State would be left with only sketchy circumstantial evidence of Gleason's involvement in the double homicide. Thus, I dissent from the majority's decision and would reverse Gleason's convictions for capital murder, aggravated kidnapping, and criminal possession of a firearm and remand for a new trial at which the State would be required to present either Thompson's in-person trial testimony or satisfy its burden of establishing that it had made a good-faith effort and acted with reasonable diligence but failed to secure Thompson's testimony.

I would not reverse Gleason's conviction for aggravated robbery, however, because Fulton and Ricky Galindo provided overwhelming evidence of Gleason's involvement in that crime. Thompson's testimony added little, if anything, and would not have affected the jury's verdict. Therefore, I concur with the majority's decision to affirm Gleason's aggravated robbery conviction.

BEIER and JOHNSON, JJ., join in the foregoing concurring and dissenting opinion.

* * *

BILES, J., dissenting: I dissent from the majority's holding that Sidney Gleason's sentence was imposed in violation of the Eighth Amendment to the United States Constitution because the district court failed to explicitly instruct the jury that mitigating circumstances need not be proven beyond a reasonable doubt. The majority's conclusion defies the United States Supreme Court's established Eighth Amendment jurisprudence and lacks any persuasive analysis articulating why the circumstances in this case justify a departure from that precedent.

As the majority concedes, the issue for Eighth Amendment purposes is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). But the majority pays only passing lip service to this test before

concluding that Gleason suffered a reversible injury to his Eighth Amendment rights. To accomplish this, the majority engages in the following rank speculation:

"Gleason's jury was left to speculate as to the correct burden of proof for mitigating circumstances and reasonable jurors might have believed they could not consider mitigating circumstances not proven beyond a reasonable doubt. Thus, jurors may have been prevented from giving meaningful effect or a reasoned moral response to Gleason's mitigating evidence, implicating Gleason's right to individualized sentencing under the Eighth Amendment." (Slip op. at 85.)

There is nothing in the record to substantiate this conjecture, and the majority points us to none. The majority's conclusion appears to be that a per se violation of the Eighth Amendment occurs if a jury instruction correctly states that the State bears the burden of proving aggravating circumstances beyond a reasonable doubt but fails to affirmatively state that mitigation evidence need not be proved beyond a reasonable doubt. But this alone cannot justify reversal under controlling Eighth Amendment precedent. See *Kansas v. Marsh*, 548 U.S. 163, 173, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); *Walton v. Arizona*, 497 U.S. 639, 651, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); see also *Smith v. Spisak*, 558 U.S. 139, 130 S. Ct. 676, 175 L. Ed. 2d 595 (2010) (instructions and jury forms at penalty phase did not violate Eighth Amendment by requiring jury unanimity as to existence of mitigating factors; instructions and forms did not explicitly advise jury mitigating circumstances need not be unanimously found).

A fundamental defect in the majority's analysis is its failure to distinguish between the Eighth Amendment's constitutional requirements and the Kansas capital sentencing scheme's statutory requirements. The majority concludes this court's directive in *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001) that juries be explicitly informed that mitigating factors need not be proved beyond a reasonable doubt somehow takes on federal constitutional dimensions because it "implicate[s] the broader Eighth Amendment principle prohibiting barriers that preclude a sentencer's consideration of all relevant mitigating evidence." (Slip op. at 83.) But

the majority acknowledges this conclusion is inconsistent with *Walton*, which the majority admits "should not be interpreted as creating any constitutional requirements as to how *or whether a capital jury should be instructed on the burden of proof for mitigating circumstances.*" (Emphasis added.) (Slip op. at 83) (citing *Walton*, 497 U.S. at 649-51).

The majority attempts to distinguish *Walton* on the grounds that Kansas' capital sentencing scheme is different from the one at issue in *Walton*. Notably, the difference is that the Arizona state law at issue in *Walton* imposed a higher burden of proof than Kansas because in Arizona mitigating circumstances must be proved by a preponderance of the evidence. 497 U.S. at 649. The Kansas statute does not impose any burden of proof requirement, which means a capital defendant is not saddled with the burden of establishing mitigating circumstances by a preponderance of the evidence. I fail to see how this distinction is "critical"—as the majority portrays it—for Eighth Amendment purposes. State law does not define the scope of federal constitutional guarantees.

Put simply, the Eighth Amendment does not compel our directive in *Kleypas*, 272 Kan. at 1078, that any mitigating circumstance instruction must inform the jury that mitigating circumstances need not be proved beyond a reasonable doubt. See *Marsh*, 548 U.S. at 173 (holding *Walton* compelled conclusion Kansas capital sentencing scheme satisfied Eighth Amendment requirements because Kansas scheme was functionally identical to scheme found constitutional in *Walton*, except it provided benefit to defendants by placing no evidentiary burden on them). So a finding that Gleason's jury instructions did not conform to the *Kleypas* requirement that jurors be informed that mitigating circumstances do not need to be proved beyond a reasonable doubt is not an adequate basis for concluding Gleason's federal Eighth Amendment rights were violated.

But even if one assumes that portion of *Kleypas* is required by the Eighth Amendment, the majority fails to adequately address the next Eighth Amendment inquiry required by *Boyde* by explaining how there is a reasonable likelihood the jury applied the instruction in a way that prevented consideration of constitutionally

relevant evidence. The majority simply concludes that reasonable jurors *"might have believed* they could not consider mitigating circumstances" or *"may have been prevented* from giving meaningful effect" to Gleason's evidence. (Emphasis added.) (Slip op. at 85.)

When determining whether there is a reasonable likelihood the jury applied the instruction in a way that prevented consideration of constitutionally relevant evidence, the *Boyde* Court considered the language of the instruction in conjunction with what happened during the proceedings. See 494 U.S. at 383-86 (noting petitioner presented 4 days of evidence about his background and character, the jury was instructed it must consider all evidence presented during any part of the trial, and the prosecutor "explicitly assumed," in closing argument, that the petitioner's background and character should be considered by the jury but merely argued the mitigating evidence was minimal in comparison to the aggravating circumstances). In my view, the majority's conclusion does not withstand a review of the evidence, instructions, and trial arguments.

Recall first the mitigating factors alleged. Gleason claimed: (1) His capacity to appreciate the criminality of his conduct was impaired; (2) he was relatively young—24 years old at the time of the crime; (3) the public would be adequately protected if he were given a term of imprisonment; (4) he had an accomplice who significantly participated in planning and committing the crimes; (5) his accomplice received only a life sentence with eligibility for parole in less than 23 years; (6) he lacked contact with his mother in his early years because she was in jail; (7) he and his siblings were all in jail at the time; (8) he was obedient and an excellent student when he lived with his great aunt; and (9) his family loved him.

Gleason's mother, great aunt, brothers, and childhood pastor testified to these circumstances; and there was little, if any, dispute about the facts establishing their existence. As to this mitigating evidence, the district court instructed the jury:

"You may further consider as a mitigating circumstance any other aspect of the defendant's character, background or record, and any other aspect of the offense which was presented in either the guilt or penalty phase which you find may serve

as a basis for imposing a sentence less than death. Each of you must consider every mitigating circumstance found to exist."

And the court went on to tell the jury that "[t]he appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed."

I see nothing in the instructions from which to conclude the jury was bewildered by them, or that there is a reasonable likelihood the jurors applied them in a way that prevented their full consideration of Gleason's mitigating factors evidence. Moreover, the parties' closing arguments further dispel the notion that there is a reasonable likelihood the jury would have applied the instruction in a way that prevented consideration of constitutionally relevant evidence.

In its closing argument, the State repeatedly told the jury it would be each juror's "individual choice" to decide whether mitigating factors exist based upon "any evidence" to support a particular factor. The State never suggested mitigation had to be proved beyond a reasonable doubt or even under the lower preponderance of the evidence standard. To the contrary, the State repetitively spoke about each mitigation factor alleged by Gleason by asking, "Did you hear any evidence about that?" or, "Can you find that one to exist based on the evidence?" In other instances, the State simply conceded a factor's existence, such as the accomplice's involvement with the crime and that the accomplice received a life sentence with parole eligibility in less than 23 years.

Indeed, a fair review of the State's closing argument shows little, if any, dispute by the prosecution as to the existence of the mitigating factors Gleason alleged and not a hint of argument that Gleason failed to demonstrate any factor's existence. Instead, the State centered its attentions on what weight those factors should be given in light of the aggravators, and there is no claim of error in that regard.

In Gleason's closing arguments, his defense counsel told the jurors:

"You're also told in [Instruction 7] that *mitigators do not have to be proven unanimously.* You all have to consider them, *but if you believe something is a mitigator,*

*it goes on your scale, it doesn't matter if anyone else places it on theirs. Likewise, you independently weigh those mitigators."* (Emphasis added.)

Defense counsel explained further that "[m]itigators are anything in your independent moral assessment whether it's on this list in Instruction 7 or not." And he later added:

"Any one of you who says no, I think that there's mitigation, be it mercy, be it something on the list, be it something on your own that outweighs aggravation guarantees Sidney life. It's minority rule in that regard. There's a presumption of life."

In other words, the penalty phase closing arguments by both the State and the defense did exactly what they were supposed to do—they helped the jury understand the evidence and apply the law. See PIK Crim. 3d 56.00-D (2001 Supp.). And they did so in a manner consistent with the United States Supreme Court's Eighth Amendment requirements. See *Smith*, 558 U.S. at 148; *Boyde*, 494 U.S. at 380-81; *Mills*, 486 U.S. at 384.

The instructions, evidence, and arguments of counsel all pointed the jury to do what it was supposed to do in the penalty phase—consider all of the mitigating factors supported by the evidence, as well as mercy for the defendant, and then render a decision on whether the death penalty should be imposed, *i.e.*, whether the State proved beyond a reasonable doubt that aggravating circumstances were not outweighed by any mitigating circumstances. There is nothing to show a reasonable likelihood that the jury applied the challenged instructions in a way that prevented consideration of constitutionally relevant evidence in this case.

For these reasons, I must conclude that the majority's rationale for reversing the sentence fails to conform to Eighth Amendment jurisprudence. I also conclude that Gleason's other sentencing challenges provide no basis for properly overturning the jury's verdict in the penalty phase of his case. I would affirm the sentence.

MORITZ, J., joins the foregoing dissenting opinion.